VAN PRODUCTS, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3235–62. Filed September 24, 1963.

---

*Charles F. Hartsock*, for the petitioner.
*Richard M. Schwartz*, for the respondent.

### OPINION

RAUM, *Judge:* The Commissioner determined deficiencies in petitioner's income tax for its taxable years ending March 31, 1959 and 1960, in the amounts of $2,304.29 and $2,496, respectively. The deficiencies were based upon the disallowance of claimed deductions in the amount of $4,800 for each of those years in respect of contributions to a profit-sharing trust. The facts have been stipulated.

Petitioner, an Ohio corporation organized in 1957, filed its returns for the years in controversy with the district director at Cincinnati.

On March 29, 1958, petitioner entered into a trust agreement with two individual trustees, hereinafter referred to collectively as the Trustee, establishing the "Van Products Profit-Sharing Trust," which provided in part as follows:

3. *Purpose of Trust.* This Trust is created for the sole purpose of enabling salaried employees of the Company to share in the profits of the Company's business. In no event shall any part of the principal or income of this Trust be paid to or revested in the Company, or be used for any purpose whatsoever other than the exclusive benefit of its salaried employees, their beneficiaries, and their families.

\* \* \* \* \* \* \*

10. *Powers and Duties of Trustee.* The Trustee, without regard to any legal restrictions, otherwise applicable to Trustees by the law of Ohio, or otherwise, shall have and may exercise the following powers:

a. The Trustee shall, with any cash at any time held by them, invest and reinvest the Fund in any securities or other property, including bonds, preferred or common stocks, whether said bonds or stock are issued by the Company or others, or first mortgages on real property, whether owned by the Company or others, and to retain such securities or other property in trust, subject, however, to the following limitations:

(1) Not less than twenty-five per cent (25%) of the cash received by the Trustee shall be invested by deposit in an insured savings and loan association.

(2) Not more than twenty-five per cent (25%) of the Funds may be invested in common stocks, whether said stocks are issued by the Company or others.

Petitioner's initial contribution to the Trust was $500.[1] Thereafter,

---

[1] The parties have stipulated that this $500 contribution was made on Mar. 21, 1958. Just how such contribution could have been made to the Trust 8 days prior to its creation is not made clear by the record.

on June 13, 1958, it contributed $2,500 to the Trust for the taxable period ended March 31, 1958, but on the same day, June 13, 1958, it borrowed $2,500 from the Trust, thereby reducing its corpus to $500. In return for the loan petitioner gave the Trustee its promissory note in the face amount of $2,500 payable in 1 year with interest at the rate of 5 percent. The loan was not secured or accompanied by mortgages or liens on property, accommodation endorsements of those financially capable of meeting the indebtedness, stocks or securities, or any other security in addition to and supporting the promissory note.

On August 7, 1958, the district director of internal revenue at Cincinnati ruled that the Trust was a qualified trust under section 401(a) of the 1954 Code and was exempt from income taxation under section 501(a).[2] That ruling, contained in a letter of August 7, 1958, to petitioner, read in part as follows:

> The plan, as evidenced by the trust indenture and other relevant information submitted with the request for a determination, has been considered and this office is of the opinion that the plan meets the requirements of Section 401(a) of the Internal Revenue Code, and that the trust established thereunder is entitled to exemption under the provisions of Section 501(a). Attention, however, is invited to Section 1.401–1(b)(3) of the Income Tax Regulations under the 1954 Code which states in part: "The law is concerned not only with the form of a plan but also with its effects in operation."

> The trust, being exempt under Section 501(a) of the Code, is subject to the provisions of Section 502 (relating to feeder organizations), Section 503 (relating to prohibited transactions), and Section 511 to 515, inclusive, (relating to tax on unrelated business income). It is also required to file an annual return (Form 990–P) as prescribed by Section 6033 of the Code. This office should be notified in writing in the event of amendment or termination of the plan or trust.

The district director also notified the Trustee on the same day as to the status of the Trust under sections 401(a) and 501(a); he similarly warned the Trustee, *inter alia*, of the provisions of section 503 relating to prohibited transactions, and called attention to the requirement for filing an annual return (Form 990–P).

On May 29, 1959, petitioner repaid the $2,500 loan with interest. Also on May 29, 1959, petitioner contributed $4,800 to the Trust for the year ending March 31, 1959; however, on June 21, 1959, it borrowed $4,800 from the Trust, thus reducing the trust corpus from approximately $7,800 to approximately $3,000. In return for the loan petitioner gave its unsecured promissory note in the face amount of $4,800 payable in 1 year and bearing interest at the rate of 5

---

[2] The ruling appears to have been given in response to a request by petitioner accompanied by a submission of the trust indenture and possibly some other materials. It does not appear that the district director or the Internal Revenue Service was informed that petitioner had borrowed the $2,500 from the Trust on the same day that it had contributed that amount.

percent. On June 10, 1960, petitioner repaid the $4,800 loan and also contributed $4,800 to the Trust for the year ending March 31, 1960. On June 13, 1960, petitioner paid the interest on the foregoing $4,800 loan.

The balance sheets of petitioner for the years ending March 31, 1958, March 31, 1959, and March 31, 1960, reflected the following:

| | Mar. 31, 1958 | Mar. 31, 1959 | Mar. 31, 1960 |
|---|---|---|---|
| **ASSETS** | | | |
| Cash | $8,656.33 | $14,369.53 | $26,247.42 |
| Notes and accounts receivable | 19,334.29 | 33,411.54 | 37,625.70 |
| Inventories | 15,562.26 | 18,682.99 | 19,922.60 |
| Prepaid expenses | 1,517.44 | 1,051.55 | 526.49 |
| Fixed depreciable assets—machinery and equipment, furniture and fixtures, automobile and airplane (less accumulated depreciation) | 31,882.95 | 30,392.84 | 25,649.26 |
| Intangible assets (less accumulated amortization) | 273.34 | 209.14 | 144.94 |
| Total assets | 77,226.61 | 98,117.59 | 110,116.41 |
| **LIABILITIES AND CAPITAL** | | | |
| Accounts payable | $43,958.51 | $50,391.92 | $49,128.31 |
| Bonds, notes, and mortgages payable (maturing less than 1 year from date of balance sheet) | 21,022.00 | 16,520.00 | 13,947.24 |
| Other current liabilities, taxes, etc. | 1,090.00 | 2,831.34 | 1,410.29 |
| Bonds, notes, and mortgages payable (maturing 1 year or more from date of balance sheet) | | 982.00 | 316.59 |
| Other liabilities: Income tax | 2,096.83 | 5,511.92 | 7,042.07 |
| Capital stock: Common stock | 4,000.00 | 4,000.00 | 4,000.00 |
| Earned surplus and undivided profits | 5,059.27 | 17,880.41 | 34,271.91 |
| Total liabilities and capital | 77,226.61 | 98,117.59 | 110,116.41 |

Petitioner reported taxable income in its returns for the years ending March 31, 1958–60, in the amounts of $7,156.10, $18,373.06, and $23,473.57, respectively. In the year ending March 31, 1961, it incurred a net operating loss in the amount of $24,068.19.

The Trust did not file for the calendar year 1958 the required Form 990–P ("Return of Employees' Trust Exempt From Tax"). However, it did file Form 990–P for the calendar years 1959, 1960, and 1961, and answered the indicated parts of question 9 on page 1 of each such returns as follows:

9. After March 1, 1954 did—
The creator of your trust * * *

| | | | | | Yes | No |
|---|---|---|---|---|---|---|
| (a) Borrow any part of your income or corpus? | | | | | | X |
| (e) Sell any securities or other property to you? | | | | | | X |
| (f) Receive any funds of the trust in any transaction? | | | | | | X |

The returns required that a detailed statement be added thereto if the answer to any part of question 9 should be "Yes." No such statement was attached to any of the returns as would have been obligatory had the Trust correctly answered "Yes" to the foregoing parts of

question 9.[3] However, on the balance sheets in its returns (Form 990–P), the Trust recorded as "Investments in employer's stock, securities or other obligations" as of the beginning of 1959 and 1960, the amounts of $2,500 and $4,800, respectively.

The foregoing summary of the facts furnishes the background for considering whether the $4,800 contributions made by petitioner to the Trust on May 29, 1959, and June 10, 1960, are deductible under section 404(a)(3)[4] for its fiscal years ending March 31, 1959 and 1960, as contributions paid by an employer under a profit-sharing plan.[5]

By its terms, section 404(a)(3) applies to contributions to a profit-sharing trust only where "the trust is exempt under Section 501(a)." Section 501(a) provides:

SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.

(a) EXEMPTION FROM TAXATION.—An organization described in * * * section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502, 503, 504.

---

[3] In this connection the returns also contained the following instructions, which were not followed by the Trust as it would have been required to do had it correctly answered "Yes" to the relevant parts of question 9 :

"If answer to question (a), (d) or (e) is 'Yes,' or if you acquired through any source debentures or other obligations or stock or securities of any of the parties enumerated, also furnish the following information relating to the debtor, purchaser, or vendor (unless previously filed and a favorable determination letter had been received) :

"(1) Balance sheets of the employer as at the close of the last accounting period and for the taxable year ended prior thereto.

"(2) Comparative statements of income and profit and loss for the last and the four prior taxable years.

"(3) An analysis of the surplus account for the last five years and specifically showing the amount and rate of dividends paid on each class of stock.

"(4) A statement accounting for all material changes from the latest dates of the aforesaid statements to the date of filing the information.

"(5) A schedule showing the nature and amounts of the various assets in the trust fund.

"(6) A statement setting forth the amount invested in the stock or securities of the employer, or a corporation controlled thereby, and the debtor, purchaser, or vendor, if another, the nature of the investment, the present rate of return, and the reason for the investment."

[4] SEC. 404. DEDUCTION FOR CONTRIBUTIONS OF AN EMPLOYER TO AN EMPLOYEES' TRUST OR ANNUITY PLAN AND COMPENSATION UNDER A DEFERRED-PAYMENT PLAN.

(a) GENERAL RULE.—If contributions are paid by an employer to or under a stock bonus, pension, profit-sharing, or annuity plan, or if compensation is paid or accrued on account of any employee under a plan deferring the receipt of such compensation, such contributions or compensation shall not be deductible under section 162 (relating to trade or business expenses) or section 212 (relating to expenses for the production of income) ; but, if they satisfy the conditions of either of such sections, they shall be deductible under this section, subject, however, to the following limitations as to the amounts deductible in any year:

* * * * * * *

(3) STOCK BONUS AND PROFIT-SHARING TRUSTS.—

(A) LIMITS ON DEDUCTIBLE CONTRIBUTIONS.—In the taxable year when paid, if the contributions are paid into a stock bonus or profit-sharing trust, and if such taxable year ends within or with a taxable year of the trust with respect to which the trust is exempt under section 501(a), * * *

[5] If the amounts are deductible, the Commissioner does not contest deductibility for the years in question on the ground that the payments were made after the close of the taxable years to which they related. Sec. 404(a)(6) provides that for purposes of paragraphs (1), (2), and (3) of sec. 404(a), "a taxpayer on the accrual basis shall be deemed to have

Thus, apart from various other conditions set forth in section 404 (a)(3) itself, if the contributions are to be deductible, the trust must meet the requirements of section 401(a) and it must not be denied exemption under section 502, 503, or 504.

Section 503(a)(1) contains the general rule that "an organization described in section 401(a) [including, *inter alia*, a profit-sharing trust] * * * shall not be exempt from taxation under section 501(a) if it has engaged in a prohibited transaction after March 1, 1954." And section 503(c) contains a catalog of "prohibited transactions." To the extent here pertinent it provides:

SEC. 503. REQUIREMENTS FOR EXEMPTION.

(c) PROHIBITED TRANSACTIONS.—For purposes of this section, the term "prohibited transaction" means any transaction in which an organization subject to the provisions of this section—

(1) lends any part of its income or corpus, without the receipt of adequate security and a reasonable rate of interest, to;

\* \* \* \* \* \* \*

the creator of such organization (if a trust) ; * * *

At the hearing the only issue stated by petitioner's counsel was whether the $2,500 loan and $4,800 loan constituted "prohibited transactions" within section 503(c)(1), it being assumed that if either loan was a prohibited transaction the deductions were properly disallowed. Petitioner's counsel argued that petitioner was solvent at all times in question and that the unsecured notes which it gave for the two loans were themselves "adequate security" within the meaning of section 503(c)(1), so as to prevent such loans from being classified as "prohibited transactions." He stated the matter as follows:

Now, this is the issue: Whether or not a single [simple (?)] promissory note, without something in addition thereto, as called for by the regulations, is adequate security in a situation where you have a perfectly solvent maker.

We hold that the loans were made without "adequate security" as that term is used in section 503(c)(1).

Since the statutory provisions before us are highly complex, it is entirely appropriate that they be the subject of clarifying regulations. Cf. *Helvering* v. *Wilshire Oil Co.*, 308 U.S. 90, 102. And the very point argued by petitioner's counsel has been specifically dealt with in the Income Tax Regulations as follows (sec. 1.503(c)–1(b)) :

(b) *Loans as prohibited transactions under section 503(c)(1)*—(1) *Adequate security.* For the purposes of section 503(c)(1), which treats as prohibited transactions certain loans by an organization without receipt of adequate security and a reasonable rate of interest, the term "adequate security" means something in addition to and supporting a promise to pay, which is so pledged to the organization that it may be sold, foreclosed upon, or otherwise disposed

made a payment on the last day of the year of accrual if the payment is on account of such taxable year and is made not later than the time prescribed by law for filing the return for such taxable year."

of in default of repayment of the loan, the value and liquidity of which security is such that it may reasonably be anticipated that loss of principal or interest will not result from the loan. Mortgages or liens on property, accommodation endorsements of those financially capable of meeting the indebtedness, and stock or securities issued by corporations other than the borrower may constitute security for a loan to the persons or organizations described in section 503(c). Stock of a borrowing corporation does not constitute adequate security. *A borrower's evidence of indebtedness, irrespective of its name, is itself not security for a loan,* whether or not it was issued directly to the exempt organization. However, if any such evidence of indebtedness provides for security that may be sold, foreclosed upon, or otherwise disposed of in default of repayment of the loan, there may be adequate security for such loan * * *. [Italics supplied.]

Petitioner admits that its position is in direct conflict with these regulations. However, we think that they are a reasonable interpretation of the Code and must be sustained, since it has long been established that regulations are valid unless unreasonable or plainly inconsistent with the statute and that they should not be overruled except for weighty reasons. *Commissioner* v. *South Texas Co.*, 333 U.S. 496, 501; *Fawcus Machine Co.* v. *United States*, 282 U.S. 375, 378; *Boske* v. *Comingore*, 177 U.S. 459, 470; *Brewster* v. *Gage*, 280 U.S. 327, 336; *Textile Mills Corp.* v. *Commissioner*, 314 U.S. 326, 336–339; *Colgate Co.* v. *United States*, 320 U.S. 422, 426.

The plain words of the statutory provisions themselves in this case, read either alone or in conjunction with closely related provisions, leave no doubt that a loan in exchange for a wholly unsecured promissory note of the borrower is not only not adequately secured but is not secured at all. It will not do to argue, as has been done by the petitioner, that it was amply solvent[6] and that therefore its note constituted "adequate security." As we read the statute, "adequate security" means adequate security and not merely the paper acknowledge of the debtor that it owes the money.

The plain meaning of the words "lends * * * without the receipt of adequate security" indicates that the loan must be secured by something more than a mere promise of the debtor to repay. Security has been defined as "[that] which makes the enforcement or promise more certain than the mere personal obligation of the debtor or

---

[6] Even the alleged fact of its high degree of solvency, thus assuring the great likelihood of repayment, is far from established on the record before us. Petitioner's balance sheets do reveal book solvency, but a close scrutiny of these balance sheets leaves unresolved such troublesome questions as the ability of petitioner to convert into cash its inventories of an undisclosed character, accounts receivable, or fixed assets. Particularly, as to the latter, book value may be one thing, but common experience all too clearly shows how often it may be difficult to realize more than a fraction of the book value when attempting to sell secondhand machinery, equipment, and the like. Moreover, the amounts of book surplus at about the times the loans were made were only $5,059.27 and $17,880.41. Possible losses during the ensuing year could easily affect the debtor's ability to repay the notes at maturity. To be sure, petitioner had net income during each of these 2 years; but there was no guarantee that such would be the case, and, in fact, during the year ending Mar. 31, 1961, it sustained a net operating loss in the amount of $24,068.19.

However, we do not base our conclusion as to this point on the degree of the debtor's solvency. In our judgment this is immaterial.

promisor, whatever may be his possessions or financial standing. It may be a pledge of property, or an additional personal obligation; but it means more than the mere promise of the debtor with property liable to general execution. It is true that the greater the possessions of the promisor, the more certain the enforcement of his promise, and in a sense the creditor is more secure; but such is not the security known and expressed in the law."[7] An unsecured promissory note is nothing more than the mere promise of the debtor to pay; the ordinary meaning of security contemplates something more than this. It is a maxim of judicial construction that the ordinary meaning of the words used is the one the legislature intended unless there is a definite indication that they are to be construed otherwise. Cf. *Avery* v. *Commissioner*, 292 U.S. 210, 214.

Petitioner has referred us to no legislative materials supporting its position that Congress intended to use the words "adequate security" to encompass a simple promissory note of the debtor. To the contrary, apart from the plain meaning of the statute, it is apparent here that Congress did not intend a meaning that differs from ordinary usage. When all parts of section 503 are read together, cf. *Hellmich* v. *Hellman*, 276 U.S. 233, 236–237, it becomes even clearer that "adequate security" means something more than the debtor's unsecured promissory note.

The pivotal statutory language contained in section 503(c)(1) in respect of loans without "adequate security" is illumined by subsections (h) and (i), which were added to section 503 by section 30 of the Technical Amendments Act of 1958. These new subsections are set forth in the margin.[8] To the extent material here they provide in

---

[7] Ballentine, Law Dictionary With Pronunciations (2d ed. 1948). See also Black, Law Dictionary (4th ed. 1957).

[8] SEC. 503. (REQUIREMENTS FOR EXEMPTION.

(h) SPECIAL RULES RELATING TO LENDING BY SECTION 401(a) TRUSTS TO CERTAIN PERSONS.—For purposes of subsection (c)(1), a bond, debenture, note, or certificate or other evidence of indebtedness (hereinafter in this subsection referred to as "obligation") acquired by a trust described in section 401(a) shall not be treated as a loan made without the receipt of adequate security if—

(1) such obligation is acquired—

(A) on the market, either (i) at the price of the obligation prevailing on a national securities exchange which is registered with the Securities and Exchange Commission, or (ii) if the obligation is not traded on such a national securities exchange, at a price not less favorable to the trust than the offering price for the obligation as established by current bid and asked prices quoted by persons independent of the issuer;

(B) from an underwriter, at a price (i) not in excess of the public offering price for the obligation as set forth in a prospectus or offering circular filed with the Securities and Exchange Commission, and (ii) at which a substantial portion of the same issue is acquired by persons independent of the issuer; or

(C) directly from the issuer, at a price not less favorable to the trust than the price paid currently for a substantial portion of the same issue by persons independent of the issuer;

(2) immediately following acquisition of such obligation—

(A) not more than 25 percent of the aggregate amount of obligations issued in such issue and outstanding at the time of acquisition is held by the trust, and

substance that certain loans which might otherwise constitute prohibited transactions under section 503(c) shall not be treated as having been made without adequate security if they meet specified conditions. As will be observed from even a casual reading of subsections (h) and (i), these conditions are comprehensive and highly restrictive. Thus, section 503(h) expressly provides that a "note * * * acquired by a trust described in section 401(a) shall not be treated as a loan without the receipt of adequate security if" (1) it is acquired on the market at a price prevailing on a national registered securities exchange or at a price related to established bid and asked prices quoted by persons independent of the issuer, or from an underwriter under specified conditions, or from the issuer provided that the price is not less favorable than that currently paid by persons independent of the issuer; (2) not more than 25 percent of the obligations of the particular issue is held by the trust and at least 50 percent is held by persons independent of the issuer; and (3) not more than 25 percent of the assets of the trust is invested in obligations of persons described in section 503(c).

There is no doubt whatever that petitioner's notes could not qualify under these provisions. Condition (3) alone, placing a 25-percent limit on the amount of the Trust's assets that could be thus invested, would make petitioner's notes ineligible since they represented over 83 percent of the assets of the Trust at the time of the $2,500 loan and over 60 percent of its assets at the time of the $4,800 loan. Also, it is clear that the notes do not satisfy the requirements of subsection (i). Plainly, Congress could not have intended such loans to be treated as adequately secured under section 503(c) and thus render

---

(B) at least 50 percent of the aggregate amount referred to in subparagraph (A) is held by persons independent of the issuer ; and

(3) immediately following acquisition of the obligation, not more than 25 percent of the assets of the trust is invested in obligations of persons described in subsection (c).

(i) LOANS WITH RESPECT TO WHICH EMPLOYERS ARE PROHIBITED FROM PLEDGING CERTAIN ASSETS.—Subsection (c)(1) shall not apply to a loan made by a trust described in Section 401(a) to the employer (or to a renewal of such a loan or, if the loan is repayable upon demand, to a continuation of such a loan) if the loan bears a reasonable rate of interest, and if (in the case of a making or renewal)—

(1) the employer is prohibited (at the time of such making or renewal) by any law of the United States or regulation thereunder from directly or indirectly pledging, as security for such a loan, a particular class or classes of his assets the value of which (at such time) represents more than one-half of the value of all his assets ;

(2) the making or renewal, as the case may be, is approved in writing as an investment which is consistent with the exempt purposes of the trust by a trustee who is independent of the employer, and no other such trustee had previously refused to give such written approval ; and

(3) immediately following the making or renewal, as the case may be, the aggregate amount loaned by the trust to the employer, without the receipt of adequate security, does not exceed 25 percent of the value of all the assets of the trust.

For purposes of paragraph (2), the term "trustee" means, with respect to any trust for which there is more than one trustee who is independent of the employer, a majority of such independent trustees. For purposes of paragraph (3), the determination as to whether any amount loaned by the trust to the employer is loaned without the receipt of adequate security shall be made without regard to subsection (h).

subsections (h) and (i) nugatory. We are fully satisfied that in enacting these subsections Congress understood that a loan evidenced by a simple unsecured note is lacking in "adequate security" within the meaning of section 503(c), and therefore provided in (h) and (i) for the treatment of such loan as though it were adequately secured, but only to the limited extent that there is compliance with the stringent and detailed conditions set forth therein. An examination of the committee reports accompanying the legislation fortifies this conclusion.[9] Only in this context do these detailed and comprehensive provisions in the 1958 Act make any sense. Congress recognized the Treasury's interpretation of "adequate security" in section 503(c)(1) as excluding an unsecured obligation of the debtor, and its enactment of subsections (h) and (i) represented a legislative effort to coordinate that interpretation with the limited exceptions carved out from section 503(c)(1) by the new provisions.

Petitioner relies in part upon *Wasatch Chemical Co.* v. *Commissioner*, 313 F. 2d 843 (C.A. 10), reversing our decision in 37 T.C. 817. That case involved the question whether the employer's issuance of its 5-year note to a profit-sharing pension trust constituted the *payment* of a contribution under section 404(a). Those provisions allow the deduction of a contribution to a qualified trust in the year the contribution is "paid," and the issue was simply one of determining the year *when* the contribution was "paid." This Court held it was not "paid" when the note was issued to the trust, but the Court of Appeals ruled otherwise. Whether the latter decision is correct, cf. concurring opinion in *Norman Petty*, 40 T.C. 521, 524–525, is of no controlling significance here; the question now before us is whether the loan of trust assets evidenced only by an unsecured note of the employer was made without "adequate security" and therefore constituted a "prohibited transaction" within the meaning of section 503(c)(1). No such issue was involved or decided in the *Wasatch* case.

In view of our conclusion, set forth above, that the loans in controversy constituted prohibited transactions within section 503(c)(1) and that the *Wasatch* case is inapplicable, the only issue presented by petitioner is therefore decided against it. Nowhere in its pleadings or briefs, or at the hearing, has petitioner affirmatively taken the further position, apart from its reliance upon *Wasatch*, that it would nevertheless be entitled to the disputed deductions for the years in controversy even if the loans should be held to be prohibited transactions. The Commissioner has suggested such a possible position

---

[9] See H. Rept. No. 775, 85th Cong., 1st Sess., pp. 21–22, 72–73, accompanying H.R. 8381, known as the Technical Amendments Act of 1957, which was passed by the House but not by the Senate in 1957, and which in substance, to the extent material here, was enacted the following year as the Technical Amendments Act of 1958. See S. Rept. No. 1983, 85th Cong., 2d Sess., pp. 49–52, 165–167.

based upon section 503(a)(2),[10] but has indicated reasons why he thinks these provisions would not be of any help to petitioner in the light of the facts disclosed by the record in this case.[11] Whether the facts of this case would preclude the denial of exemption to the Trust for the years in controversy under section 503(a)(2), notwithstanding that it had engaged in prohibited transactions, is a matter that we do not decide. Petitioner has neither raised nor presented any such issue for decision. Cf. *Nathan Goldsmith*, 31 T.C. 56, 63–64. In a field as complex as the one before us, involving statutory provisions that are so confusingly interrelated and intricate as to be exasperating, cf. *Thomas G. Lewis*, 35 T.C. 71, 76, it is particularly important not to embark upon an exploration of issues not properly presented. In the circumstances we express no opinion as to the applicability of section 503(a)(2), nor is it necessary to give any consideration to the Commissioner's further contention that the Trust was not being operated for "the exclusive benefit" of the employees or their beneficiaries, sec. 401(a).

In order to give effect to a carryback arising from uncontested net operating losses sustained after the years before us,

*Decision will be entered under Rule 50.*

---

[10] SEC. 503. REQUIREMENTS FOR EXEMPTION.

(a) DENIAL OF EXEMPTION TO ORGANIZATIONS ENGAGED IN PROHIBITED TRANSACTIONS.—

\* \* \* \* \* \* \*

(2) TAXABLE YEARS AFFECTED.—An organization described in section 501(c)(3) or (17) or section 401(a) shall be denied exemption from taxation under section 501(a) by reason of paragraph (1) only for taxable years after the taxable year during which it is notified by the Secretary or his delegate that it has engaged in a prohibited transaction, unless such organization entered into such prohibited transaction with the purpose of diverting corpus or income of the organization from its exempt purposes, and such transaction involved a substantial part of the corpus or income of such organization.

[11] The record does not show whether the Secretary or his delegate sent any such notice as is contemplated by sec. 503(a)(2), other than the deficiency notice herein, dated June 6, 1962. The Commissioner argues, however, that not only did the prohibited transactions involve a substantial part of the Trust's assets, but that the facts of record show that, in the language of the statute, the Trust entered into the prohibited transactions "with the purpose of diverting corpus or income \* \* \* from its exempt purposes," thereby depriving petitioner of the benefit of these provisions for the taxable years herein.