W. C. Gamman and Harriett Gamman, et. al.,[1] Petitioners, v. Commissioner of Internal Revenue, Respondent

Docket Nos. 5268–64, 3763–65, 5270–64, 3877–65. Filed April 4, 1966.

*Roger E. Lageschulte*, *Warren V. Clodfelter*, and *Richard F. Kroetch*, for the petitioners.
*Richard G. Daly*, for the respondent.

Drennen, *Judge:* Respondent determined deficiencies in petitioners' income taxes and an addition to tax, as follows:

| Docket No. | Petitioner | Year | Deficiency | Addition to tax, sec. 6651 [2] |
|---|---|---|---|---|
| 5268–64 | W. C. Gamman and Harriett Gamman | 1958 | $2,997.29 | |
| | | 1959 | 3,238.11 | |
| | | 1962 | 1,271.55 | |
| 3763–65 | W. C. Gamman and Harriett Gamman | 1961 | 6,800.00 | |
| 5270–64 | David M. Reese and Dorothy Ione Reese | 1960 | 3,127.18 | |
| | | 1961 | 5,971.24 | $1,492.81 |
| 3877–65 | David M. Reese and Dorothy Ione Reese | 1962 | 8,240.81 | |

In his answer filed in docket No. 5268–64 respondent claimed increased deficiencies for the years 1958 and 1962 in the amounts of $3,600.44 and $11,579.35, respectively. In his answer filed in docket No. 5270–64 respondent claimed an increased deficiency in tax and addition to tax for the year 1961 in the amounts of $18,402.52 and $4,600.63, respectively.

All issues in all docket numbers have been agreed upon by the parties except one, common to all docket numbers, which is whether Century House, Inc., a corporation in which Gamman and Reese were equal owners of all the outstanding stock, qualified as a "small busi-

---

[1] Proceedings of the following petitioners are consolidated herewith: David M. Reese and Dorothy Ione Reese, docket Nos. 5270–64 and 3877–65.

[2] All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.

1

ness corporation" under subchapter S (secs. 1371–1377), I.R.C. 1954, the underlying issue being whether purported loans to the corporation by the stockholders constituted a second class of stock. Respondent raised this issue in his answers filed in docket No. 5268–64 (Gamman for the year 1962) and docket No. 5270–64 (Reese for the year 1961), and in his notices of deficiency in docket No. 3763–65 (Gamman for 1961) and docket No. 3877–65 (Reese for 1962). All the docket numbers were consolidated for trial and opinion, but because of the posture of the pleadings and its effect on the burden of proof the Court agreed to decide the issue without reliance on the burden of proof.

FINDINGS OF FACT

W. C. Gamman (referred to herein as Gamman) and Harriett Gamman, husband and wife residing in Seattle, Wash., filed joint income tax returns for the years 1958, 1959, 1961, and 1962 with the district director of internal revenue, Tacoma, Wash.

David M. Reese (referred to herein as Reese) and Dorothy Ione Reese were husband and wife residing in Seattle, Wash., during the years here involved, and filed joint income tax returns for the years 1960, 1961, and 1962 with the district director of internal revenue, Tacoma, Wash.

Century House, Inc. (referred to herein as Century House), filed U.S. Small Business Corporation returns for the years 1961 and 1962 with the district director of internal revenue, Tacoma, Wash.

In 1959 plans were under discussion to hold a World's Fair in Seattle. The discussions indicated that the fair would open in the spring of 1961 and continue throughout the warm weather seasons of both 1961 and 1962. One concern was whether there were adequate lodging facilities in Seattle for the anticipated tourists. This gave Gamman, Reese, and William L. Hiller the idea of building a motel near the proposed site of the fair. A contract to purchase land for this purpose was entered into in April 1959. Century House was incorporated under the laws of the State of Washington as the vehicle to build and operate this motel.

The articles of incorporation for Century House were filed with the secretary of state of Washington on October 15, 1959, and were general in nature. The authorized capital stock of the corporation was 500 shares of stock having no-par value, and the amount of paid-in capital with which the corporation was to begin business was stated to be $500. The articles of incorporation had not been amended prior to the end of the years here involved and the corporation was not authorized to issue a second class of stock.

On October 21, 1959, each of the three original stockholders, Gamman, Reese, and Hiller, paid $200 to the corporation for capital stock

and also advanced the corporation $5,333.33 in return for demand notes bearing 6-percent interest. Each of the three stockholders also advanced to the corporation $2,500 in cash on November 13, 1959, and $1,500 in cash on December 11, 1959, and received in return demand notes of the corporation in like amounts bearing 6-percent interest. By the close of 1959 the advances of the stockholders totaled $28,000.

In January 1960 the corporation bought the stock owned by Hiller for $200 and paid off his advances without interest. Since that time Gamman and Reese each owned one-half of the outstanding stock of Century House and were its principal officers and directors.

The expense of organizing the corporation was $1,404.05. On October 21, 1959, Century House acquired the land for the motel for $114,400 under a real estate contract which provided for $20,000 to be paid in cash by closing and the balance to be paid on or before November 1, 1962. The sellers agreed that if buyer obtained a first mortgage construction loan for building an apartment motel on the property they would subordinate their real estate contract to the construction loan and take a second mortgage on the property as security for the unpaid balance of the purchase price. All three original stockholders and their wives guaranteed performance of the real estate contract and the second mortgage. Soon thereafter construction of a motel was commenced on the property with funds advanced by the stockholders.

On February 25, 1960, Century House received a construction loan from Securities Mortgage Co. in the amount of $412,000, secured by a first mortgage on the property. A commitment for a take-out loan in the amount of $400,000 had been arranged with a life insurance company for permanent financing of the project. However, this proved to be insufficient in amount and the loan was never consummated. On January 12, 1961, Century House borrowed $175,000 from an outside lender, secured by a third mortgage on the property, on which petitioners became personally liable. On January 1, 1962, Century House borrowed $95,000 from Securities Mortgage Co. to partially refinance the construction loan. The petitioners were personally liable on this loan and it was secured by mortgages on their personal residences.

On January 16, 1962, Century House borrowed $600,000 from Fidelity Savings & Loan Association which was used to pay off the construction loan and the second mortgage. This loan, which was intended to be the permanent financing of the project, was secured by a first mortgage on the property and, in accordance with the standard policy of the lender in lending money to closely held corporations, the petitioners were personally liable for payment of the loan. The loan was

conditioned upon the borrower adding a restaurant, laundry, and bar to the motel, which was done by the end of 1962.

Petitioners originally intended and hoped to obtain 100-percent permanent financing of the project from outside sources, and hoped to recover their advances to the corporation from such financing and the anticipated profits from operation of the motel. When petitioners first conceived the idea of building the motel construction funds were readily available in the Seattle area at a reasonable cost and, because of the usual increment in value of property after it was improved and anticipated high earnings from operations during the fair, some builders were able to finance their housing projects to the extent of 100 percent of cost. Petitioners originally hoped to operate the motel profitably for the 2 years the fair was supposed to be in operation and then sell out at a profit. The motel was opened for business in February 1961. However, plans for the fair were changed and it did not open in 1961 as intended, but opened in 1962 and stayed open for only 6 months, and did not attract the tourist trade that was hoped for. In addition, numerous other people in Seattle had the same idea as petitioners and there was a surplus of new housing facilities built, with the result that the cost of construction increased, and the money market for tourists' housing facilities changed, and money for construction and permanent loans became scarce. As a result of the above circumstances the cost of constructing the motel was greater than anticipated, petitioners were unable to obtain the outside financing they had hoped for, Century House operated at a loss during the years 1961 and 1962, and petitioners had to advance more of their own funds to the corporation to keep it going.

At various times during the years 1960, 1961, and 1962, and continuing thereafter, Gamman and Reese advanced rather sizable amounts of cash to Century House in approximately equal amounts. The total of the amounts advanced by them at the end of 1960 was $68,066.67, at the end of 1961 was $165,670.80, and at the end of 1962 was $252,-343.80. These advances to the corporation were evidenced by 6-percent demand notes. No interest had been paid on the notes and no efforts had been made by petitioners to force payment of the obligations up to the time of the trial herein. From time to time new notes of a similar character were issued to petitioners in return for old notes to avoid the statute of limitations barring collection of the old notes; and petitioners waived the interest due on the notes. The advances were carried on the books of Century House as long-term liabilities. Capital stock was shown on the balance sheet as $400 until 1964.

By the end of 1962 the balance sheet of Century House reflected current assets in the amount of $36,609.53; fixed assets, including land, buildings, furniture and fixtures, and linens, having an original cost

of $1,062,342.54; and other assets in the amount of $9,147.24. The balance sheet also reflected current liabilities totaling $242,315.05; long-term liabilities totaling $845,149.54, of which $245,228.20 was due to Gamman and Reese; capital stock, less treasury stock, in the amount of $400; and a deficit in the earnings account of $183,366.21.

In July 1963 Century House was able to obtain another long-term loan of $200,000 from Fidelity Savings & Loan Association, which was guaranteed by the Small Business Administration after petitioners established to the satisfaction of the Small Business Administration that they were unable to obtain financing from other sources at a reasonable rate of interest. Petitioners were personally liable for this loan and agreed they would receive no payment for their advances until the loan was paid, and that the corporation would not pay dividends or salaries to Gamman and Reese.

In December 1964 Century House was recapitalized and a substantial portion of the advances made by the stockholders was converted into additional stock, bonds, and paid-in capital of the corporation.

On January 25, 1961, Century House, with the consent of all its stockholders, filed the election authorized by section 1372(a) of the Code not to be subject to the taxes imposed by that chapter. Petitioners claimed their prorata shares of the operating losses of Century House for the years 1961 and 1962 as deductions on their individual income tax returns for the years 1961 and 1962. Respondent has disallowed these deductions claimed by petitioners on the ground that petitioners' advances to the corporation constituted a second class of stock, as a result of which Century House did not qualify as a small business corporation under section 1371(a) of the Code.

OPINION

The one basic issue for decision is whether Century House qualified as an electing small business corporation under subchapter S of the Code during the years 1961 and 1962.

Section 1371 defines the term "small business corporation" as a domestic corporation which is not a member of an affiliated group and which does not (1) have more than 10 shareholders; (2) have as a shareholder a person (other than an estate) who is not an individual; (3) have a nonresident alien as a shareholder; and (4) have more than one class of stock. It is not questioned that Century House met all the requirements for qualification as an electing small business corporation for the years 1961 and 1962, except the last, i.e., that it not have more than one class of stock. Respondent claims that the advances to the corporation by the shareholders were actually advances of equity capital rather than loans and constituted a second class of

stock. Respondent's argument is based on section 1.1371–1(g), Income Tax Regs., which provides in material part as follows:

A corporation having more than one class of stock does not qualify as a small business corporation. * * * If the outstanding shares of stock of the corporation are not identical with respect to the rights and interest which they convey in the control, profits, and assets of the corporation, then the corporation is considered to have more than one class of stock. Thus, a difference as to voting rights, dividend rights, or liquidation preferences of outstanding stock will disqualify a corporation. * * * If an instrument purporting to be a debt obligation is actually stock, it will constitute a second class of stock.

Respondent argues that the promissory notes issued to the shareholders in return for their advances to the corporation actually constituted a 6-percent preferred nonvoting stock—a second class of stock.

Petitioners argue that the advances made by the stockholders were intended to be loans and did not constitute equity capital, and hence the notes evidencing the advances were not actually stock; and, further, that the last sentence of respondent's regulations quoted above is invalid.

The statute itself provides only that the corporation must not have more than one class of stock; while respondent's regulation provides that "If an instrument purporting to be a debt obligation is actually stock, it will constitute a second class of stock." There is no explanation in the regulation of what is meant by the term "actually stock"; but respondent's argument on brief is based on the premise that if the advances reflected by the notes were, in fact, invested capital, the notes are actually stock. Formally, Century House did not have more than one class of stock; it was authorized to issue only one class of stock and that is all it actually issued. The above-quoted sentence of respondent's regulation, as applied in his argument on brief, therefore appears to enlarge the scope of the statutory provision by providing that if an instrument in the form of a debt obligation actually represents equity capital, it constitutes a second class of stock and it disqualifies the corporation under subchapter S. Thus, the first question presented is whether this interpretation of the statutory provision falls within the scope of the Commissioner's authority.

The Commissioner is authorized under section 7805 of the 1954 Code to prescribe all needful rules and regulations for the enforcement of the tax laws. Such regulations, insofar as consistent with expressed statutory provisions, have the force and effect of law. *Maryland Casualty Co.* v. *United States*, 251 U.S. 342. However, the power of the Commissioner to prescribe regulations for the administration of the Federal tax laws is not the power to make law but is only the power to carry into effect the will of Congress as expressed by the statute. *Manhattan Co.* v. *Commissioner*, 297 U.S. 129. A regulation may not alter or amend the revenue law, *Morrill* v. *Jones*, 106 U.S. 466; nor

extend a statute or modify its provisions, *Campbell* v. *Galeno Chemical Co.*, 281 U.S. 599; nor may it take away any rights and privileges which the Congress has given, *Russell Manufacturing Co.* v. *United States*, 175 F. Supp. 159 (Ct. Cl. 1959); nor can it impose or add a condition which Congress did not impose, unless such condition is necessary to make effective the conditions imposed by Congress, *Philadelphia Electric Co.* v. *United States*, 117 F. Supp. 424 (Ct. Cl. 1954). We must determine whether the additional provision contained in the last sentence of respondent's regulation is a reasonable interpretation of the statutory requirement that the corporation have only one class of stock, and is consistent with the purpose and intent of Congress in enacting that provision of the statute.

Subchapter S (Code secs. 1371–1377) became a part of the Code for the first time as section 64 of the Technical Amendments Act of 1958, H.R. 8381, 85th Cong., 2d Sess. The provisions were not included in the bill as it originally passed the House of Representatives, but were added by the Senate Finance Committee. See S. Rept. No. 1983, 85th Cong., 2d Sess., p. 88, 1958–3 C.B. 1009. So far as we can determine from the committee reports the object of the provisions was to permit businesses to select the form of business organization desired, without the necessity of taking into account major differences in tax consequences. The provisions were a counterpart to the provisions enacted in the 1954 Code (sec. 1361), which permitted proprietorships and partnerships to elect to be taxed like corporations, and were designed to permit electing corporations to forgo the payment of tax and require their shareholders to report the corporate income (whether or not distributed) as their own for tax purposes. One of the specific objectives was to permit the shareholders to deduct the operating losses of the corporation against other income, which would not ordinarily be available to the corporation itself in the loss year (Code sec. 1374). See S. Rept. No. 1983, 85th Cong., 2d Sess., pp. 87–89, 1958–3 C.B. 922, pp. 1008–1010.

We find very little said in the legislative history of subchapter S regarding the requirement that, in order to qualify, a corporation must not have more than one class of stock. It would appear that it was so provided to conform to the general design to give relief from double taxation to the shareholders of small corporations which were essentially comparable to partnerships and proprietorships, where the earnings are taxed to the owners rather than to the business organizations (although there seems to be nothing in the law to make it inapplicable to a large corporation having only a few stockholders and only one class of stock); and to avoid the complexities involved in passing the earnings of a corporation through to its stockholders where the stock of the corporation is held by a widely diversified group of stockholders

with different rights. See S. Rept. No. 830, 88th Cong., 2d Sess., p. 146, 1964–1 C.B. (Part 2) 650.

While we agree that the statutory language and the above objectives permit inquiry into whether an electing corporation has, in fact, more than one class of stock, we find nothing in the law itself, the committee reports, or the assumed purpose of the legislation that would justify holding, arbitrarily and per se, that all instruments which purport to be debt obligations but which in fact represent equity capital, must be treated as a second class of stock for purposes of section 1371. Consequently, we think the last sentence of the regulation, if given the connotation argued by respondent in this case, is too broad and places a restriction on the stockholders of electing corporations which was not intended by Congress. Congress obviously anticipated that stockholders of electing corporations could advance funds to corporations in the form of loans without disqualifying the corporation for subchapter S status, because it specifically made provision in section 1376 for adjustment of a shareholder's basis in any indebtedness owing him by the electing corporation for operating losses of the corporation made available to the shareholder as a deduction. But under the regulation, applied as it is by respondent in this case, if the note or evidence of indebtedness is "actually stock," the corporation is automatically disqualified under subchapter S regardless of the terms of the note or the practical effect thereof. We think this is tantamount to an extension or modification of the law and goes beyond the Commissioner's powers. Where a regulation is an amendment or modification of the statute and therefore beyond the power of the Commissioner to make, courts must refrain from giving it effect. *Louisville Gas and Electric Co.* v. *United States*, 148 Ct. Cl. 671 (1960). We think such is the situation here.

But we must still determine, independent of the regulation, whether the notes issued by Century House to petitioners must, because of the purported rights and interest they gave petitioners in the income and assets of the corporation, be considered to be a second class of stock for purposes of subchapter S. Respondent relies on the so-called thin capitalization cases, such as *O. H. Kruse Grain & Milling* v. *Commissioner*, 279 F. 2d 123; *Rowan* v. *United States*, 219 F. 2d 51; *Nassau Lens Co.* v. *Commissioner*, 308 F. 2d 39; *Gilbert* v. *Commissioner*, 248 F. 2d 399; and *2554–58 Creston Corp.*, 40 T.C. 932, to conclude that the purported loans by petitioners to Century House were in reality contributions of additional capital, and that, as a corollary, the notes received by petitioners as evidence thereof were in substance stock, although in form they were debt obligations. Respondent then relies on the formal terms of the instruments to conclude that they gave petitioners rights in the income and assets of the corporation having

priority over the rights petitioners had as stockholders, and therefore the notes were a second class of stock.

We think that if we are to determine the character of the instruments by reference to the substance of the underlying transactions, we must also look to the realities of the situation to determine whether the instruments, even though they might represent equity capital, actually gave the holders thereof any rights and interests in the corporation different from that owned by the holders of the nominal stock. We do not think they did under the circumstances here present, because the advances were made and the notes were held by the stockholders in direct proportion to their stockholdings. Not only were the terms of the notes waived or ignored by petitioners as noteholders, but whatever preferences the notes gave them in the income and assets of the corporation, if enforced, were preferences only over themselves as stockholders.

The notes purported to give petitioners the right to periodic payments of a fixed amount of interest; but they waived this right. The notes also purported to give them the right to have their advances repaid on demand, but they made no such demand. The notes gave the holders no right to vote or have any voice in the management of the corporation. It is rather obvious that petitioners placed little, if any, reliance on the rights and preferences granted them by the notes in making their advances to the corporation. It is likely that in the event of bankruptcy of the corporation a bankruptcy court would have subordinated their claims to those of common creditors. See *Pepper* v. *Litton*, 308 U.S. 295. Petitioners were simply advancing the corporation additional funds as it needed them for acquisition of capital assets and working capital. These advances were placed at the risk of the business just the same as the amounts petitioners paid for the capital stock. But by the same token, we think the notes would have to be considered a nullity insofar as they purported to give petitioners any rights and interests in the income and assets of the corporation different from the rights and interests they had as owners of all the capital stock of the corporation. Under the circumstances here present we do not believe the notes can be considered true debt obligations, nor can they be considered to be a second class of stock. The advances for which the notes were given were simply contributions of additional capital which were in reality reflected in the value of the common stock already held by petitioners.

In the discussion above we have considered that the advances made by petitioners were actually equity capital placed at the risk of the business. Without launching into an extended discussion of the evidence, we think it is pretty obvious from the record as a whole that these advances were placed at the risk of the business and in that sense

represented equity capital. Petitioners argue that the intent of the parties with respect to the advances is the most important criterion in this determination, and that their evidence is uncontradicted that both they and the corporation at all times intended their advances to be recovered out of the permanent third-party financing of the construction and the anticipated quick profits the corporation would realize from the fair. While we agree that the intent of the parties is an important factor to be considered, see *Rowan* v. *United States, supra,* that factor alone is not decisive; and furthermore the intent of the parties cannot always be determined from their statements and their book entries alone, but must be borne out by the economic realities of the situation. As said in *Bazley* v. *Commissioner,* 331 U.S. 737, 741, "the form of a transaction as reflected by correct corporate accounting opens questions as to the proper application of a taxing statute; it does not close them." "[T]he significant factor [is] * * * whether the funds were advanced with reasonable expectations of repayment regardless of the success of the venture or were placed at the risk of the business," *Gilbert* v. *Commissioner, supra.*

It seems pretty obvious here that regardless of the intentions, hopes, and expectations of petitioners at the time they started this venture that they would get their advances back in a short time, it very rapidly became apparent that these hopes would not be realized. They must have realized that they could not recover their advances in a short time unless the corporation could obtain outside financing in an amount that would cover not only 100 percent of the cost of the land, the building, and the furniture and fixtures, but would also provide some funds for operating expenses, because the organization expenses alone far exceeded the designated capital of the corporation. It was quite evident by 1961 that this could not be accomplished. The ratio of the corporation's long-term liabilities to its nominal capital at the end of 1960 was about 1,100 to 1; but petitioners had to continue pumping their own money into the project. The ratio of petitioners' unpaid advances to their capital contributions was about 170 to 1 at the end of 1960. It is clear that outside investors would not have made the same loans to the corporation on the same terms petitioners did; Century House had difficulty raising the necessary cash on secured notes at maximum rates of interest. So we must conclude that in economic substance the advances by petitioners constituted risk capital rather than loans. But for the reasons heretofore stated we have concluded that the notes representing those advances did not constitute a second class of stock and that Century House did not have more than one class of stock within the meaning of section 1371.

Respondent claims that because of the interplay of sections 1376 and 1232 of the Code, petitioners will gain an unintended tax advantage if

the corporation is recognized as a subchapter S corporation because they might recover amounts previously deducted as ordinary losses (the operating losses of the corporation which are passed through) at capital gains rates. Without going into the details of why this result might be reached, we point out that if this is a loophole it is a legislative oversight and should be more appropriately plugged by congressional action rather than by judicial legislation. This purported tax advantage has been recognized by the writers of tax articles ever since enactment of subchapter S. See Anthoine, "Federal Tax Legislation of 1958: The Corporate Election and Collapsible Amendment," 58 Col. L. Rev. 1146; Caplin, "Subchapter S and Its Effect on the Capitalization of Corporations," 13 Vand. L. Rev. 185. Nothing has been done about it. We also observe that there are tax disadvantages in the area of operating losses of subchapter S corporations, as well as the supposed advantage mentioned above, because if the operating losses of the corporation exceed the basis of the stockholders in both their stock and indebtedness, any excess of operating losses will apparently be lost forever. Further, we note that this is the only purportedly unintended tax advantage arising out of this situation which respondent has called to our attention.

Finally, respondent argues that to hold for petitioners on this issue would be contrary to our decision in *Catalina Homes, Inc.*, T.C. Memo. 1964–225, and to the decision of the U.S. District Court for the Middle District of Alabama in *Henderson* v. *United States*, 245 F. Supp. 782, on appeal (C.A. 5). An examination of the briefs filed with this Court in *Catalina Homes, Inc.*, *supra*, reveals that the applicability and validity of respondent's regulations was assumed by the parties, or at least was not argued, and the Memorandum Opinion of the Court does not pass on that issue. Neither does the published opinion of the court in *Henderson* v. *United States*, *supra*. Both opinions concern themselves only with whether advances by stockholders were in fact loans or equity capital; and we do not consider that either of them rules on the applicability or the validity of the last sentence of respondent's regulation discussed above. Consequently, we do not think those cases are controlling here. We know of no other court decision which has passed on this question. We believe it is a question of fact in each case whether advances by stockholders in the form of loans, which in economic substance are equity capital, constitute a second class of stock, and that this must be decided in each case independent of the last sentence of respondent's regulation.

We wish to emphasize that our consideration is limited to the facts and circumstances as they existed during the years before us and we make no judgment with respect to the qualification of the corporation in subsequent years if the facts and circumstances are different. It

appears that one of the recognized advantages or disadvantages of the provisions of subchapter S is that the status of an electing corporation may be voluntarily or involuntarily changed from a qualified corporation to an unqualified corporation at any time, so we see no need to extend our consideration of the status of Century House beyond the years here involved. We also observe that while we have given lip service to the so-called thin capitalization doctrine we have some doubt as to its applicability in determining whether a corporation has more than one class of stock for purposes of subchapter S. That doctrine was promulgated by the courts to prevent the avoidance of the double tax in the normal corporation situation by distributing corporate earnings to the stockholders in the form of interest or repayments of loans. The underlying purpose of subchapter S appears to be to avoid this double tax on corporate earnings and we see little in the way of unintended tax advantages that might be gained by having the stockholders advance funds in the form of loans rather than capital where, as here, the corporation has no accumulated earnings and profits.

We decide the only issue remaining for decision for petitioners. Because of other issues resolved by the parties in docket Nos. 5268–64, 5270–64, and 3877–65, the decisions in those dockets require Rule 50 computations. The issue decided herein being the only issue involved in docket No. 3763–65, that docket does not require a Rule 50 computation. Consequently,

> *Decisions will be entered under Rule 50 in docket Nos. 5268–64, 5270–64, and 3877–65.*
> *Decision will be entered for the petitioners in docket No. 3763–65.*

Reviewed by the Court.

WITHEY, *J.*, concurring: I concur in the result reached on the issue whether there is more than one *class* of stock here within the meaning of section 1371 of the 1954 Code and Income Tax Regs., sec. 1.1371–1(g). I do not believe it is necessary to question the validity of the regulation for it seems to me the regulation itself requires the conclusion reached.

With respect to the holding herein that the promissory notes involved were not a second class of stock within the meaning of the statute or "actually stock" within the meaning of the regulation because their holders had no intention to enforce their rights thereunder, I arrive at the conclusion reached in the opinion upon the theory that these notes, in the hands of these petitioners and in the taxable years before us, were not "actually stock" under any theory. In that connection I believe the Commissioner's use of the quoted phrase "actually stock" has more force than do the phrases so often used in thin capitalization cases "similar to stock" or "of the character of stock." It seems to

me the Commissioner means what he says, i.e., that the elements of character of the so-called debt obligation must be the same as the elements characterizing a share of stock. It does not seem that the promissory notes involved in this case have sufficient of such character to be designated "actually stock." In the first place, they may be called on demand of the holder; secondly, the interest (which under the thin capitalization cases would be likened to dividends) is payable from the very assets of the corporation if necessary, unlimited by its earnings; and thirdly, the amount of earnings to be derived from the capital invested (interest) is an amount fixed by a percentage of the principal (or investment) which is required to be paid at fixed intervals. I know of no State which permits the issuance of any class of stock with these characteristics.

I do not agree however that the intention of the holders of the notes here involved has any bearing upon the question whether or not they constitute stock or a second class of stock.

Scott and Tannenwald, *JJ.*, agree with this concurring opinion.

———

Dawson, *J.*, concurring: I concur in the result reached in the majority opinion and I agree with most of what Judge Drennen says. However, I want to add that in view of the decisions in *Catalina Homes, Inc.*, T.C. Memo. 1964–225, and *Henderson v. United States*, 245 F. Supp. 782, as well as the position taken by the respondent in Rev. Rul. 63–226, 1963–2 C.B. 341, it seems to me that any type of loan from stockholders will throw a cloud over a small business corporation. I believe this is not in accord with the legislative history of subchapter S, which indicates that the single class of stock requirement was imposed primarily to avoid the necessity for complex rules of allocation. In addition, section 1376(a) specifically establishes rules on adjusting the basis of indebtedness which a subchapter S corporation may owe to a stockholder. Consequently, I think the second class of stock doctrine, as stated in the regulations, is inconsistent with the intent of Congress and may produce grave inequities that were never originally contemplated.

Hoyt, *J.*, agrees with this concurring opinion.

———

Raum, *J.*, dissenting: In subchapter S of chapter 1 of the 1954 Code, as amended, Congress has accorded specified benefits to certain corporate taxpayers that qualify as "small business corporation[s]," and it has defined that term so as to exclude corporations having "more than one class of stock." Sec. 1371(a)(4). Since there is a wide variety of corporate instruments, however labeled, reflecting the domi-

nant characteristics of risk capital, it was certainly appropriate for the Commissioner to promulgate regulations as to the meaning of the phrase "one class of stock." He has done so here, sec. 1.1371–1(g), Income Tax Regs., and has ruled that "If an instrument purporting to be a debt obligation is actually stock, it will constitute a second class of stock."

In my judgment this regulation falls within the Commissioner's rule-making power, and should be sustained since it is clearly not inconsistent with the statute. A fair reading of the prevailing opinion leads to the conclusion that the Court has invalidated the regulation as applied here. Yet the rule has long been established that regulations must be treated as valid unless unreasonable or plainly inconsistent with the statute and that they should not be set aside except for weighty reasons. *Commissioner* v. *South Texas Co.*, 333 U.S. 496, 501; *Fawcus Machine Co.* v. *United States*, 282 U.S. 375, 378; *Boske* v. *Comingore*, 177 U.S. 459, 470; *Brewster* v. *Gage*, 280 U.S. 327, 336; *Textile Mills Corp.* v. *Commissioner*, 314 U.S. 326, 336–339; *Colgate Co.* v. *United States*, 320 U.S. 422, 426; *Estate of Richard R. Wilbur*, 43 T.C. 322, 328; and *Van Products, Inc.*, 40 T.C. 1018, 1024.

In the present case the Court has found that the notes in question actually reflect risk capital and do not represent a genuine indebtedness. In the circumstances, since these instruments establish different rights and liabilities from those associated with the corporation's common stock, it is entirely appropriate to conclude that they represent a second class of stock within the meaning of the regulations.

It is no answer to say that these rights and liabilities may be ignored in view of the Court's conclusion that there was no intention to enforce the notes according to their terms. The point is that by thus subordinating the notes the stockholders in effect made them equity instruments with rights and liabilities that might be enforced only at some later time when the corporation might have earnings or other funds permitting such course of action. As thus modified the notes resemble cumulative nonparticipating redeemable preferred stock. If they had been so designated, I think there would be no question that these equity instruments would constitute a second class of stock. Is a different result required by reason of a different label? The regulations in effect say no, and I think that answer is consistent with whatever legislative purpose may have induced Congress to exclude from the category of small business corporations those having more than one class of stock. Certainly, it is not inconsistent with the words of the statute, and if there was any legislative purpose leading to the opposite interpretation, it has not been spelled out in the majority opinion.

TIETJENS, BRUCE, PIERCE, and MULRONEY, *JJ.*, agree with this dissent.