ESTATE OF ARTHUR L. HOBSON, DECEASED, JOHN L. HOBSON, ADMINISTRATOR, C. T. A., AND MRS. ALICE C. G. HOBSON, SURVIVING WIFE, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GEORGE W. LANGDON, JR., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GEORGE W. LANGDON, JR., INDIVIDUALLY AND AS ADMINISTRATOR OF THE ESTATE OF MARJORIE B. LANGDON, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 25951, 25961, 25962.   Promulgated November 27, 1951.

Charles D. Post, Esq., for petitioners in Docket No. 25951, and Bennett Sanderson, Esq., for petitioners in Docket Nos. 25961 and 25962.

Joseph Landis, Esq., for the respondent.

**OPINION.**

Van Fossan, *Judge:* Respondent has conceded that $2,614.10 of the $16,250 distributed by Bradley-Goodrich, Inc., in 1943 was properly

reported by Hobson. As for the remainder of the distributions made during the period under review, respondent contends that they were taxable dividends within the meaning of section 115 (a), Internal Revenue Code.[1] This contention is not disputed by petitioners. It is agreed by all that some one owes the tax. The decision as to which petitioners are taxable on such dividends constitutes the sole issue herein.

The facts briefly summarized are these: On October 11, 1943, Hobson and Langdon executed a contract in which the former agreed to sell and the latter agreed to buy 250 shares of the stock of the corporation at a price of $36,250. The total shares outstanding at this time numbered 253. The 250 shares here in question had previously been placed with Hobson as collateral for his loan of $25,000 to one Everett Bradley. Upon default in repayment of any of this loan, Hobson had had these shares transferred to his own name, having previously taken a deduction for the entire $25,000 as a bad debt. The agreement between Hobson and Langdon called for a purchase of 125 such shares in 1943 for which $18,125 would be paid and the purchase of the remaining 125 shares in 1944 for a like payment. All shares were to be left in Hobson's name and possession until the total purchase price had been fully paid. The contract also provided that Hobson would not sell, alienate, or otherwise encumber these shares except upon default by Langdon. In this event Hobson could sell them at public auction and apply the amount so received against the remaining purchase price with any excess payable to Langdon. It was further agreed that any dividend received by Hobson as record owner should be credited on the purchase prices. In 1943, 1944, and 1945 Hobson received such dividends in the amounts of $16,250, $10,500, and $6,000, respectively. He also was paid $1,875 in 1943 and $1,625 in 1945 by Langdon's personal checks. The 250 shares were transferred on the corporate books to Langdon on January 25, 1945. Hobson, in his returns for all three years, reported the amounts so received as a long term capital gain from a basis of zero. Langdon reported none of the dividends in his returns for any year.

The dividends were distributed from the corporation's current earnings and profits, and represented earnings upon its stock shares taxable to some one. *DeGuire* v. *Higgins*, 159 F. 2d 921, certiorari denied 331 U. S. 858. Langdon argues that since Hobson was the record owner of the shares until January 5, 1945, the dividends there-

---

[1] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(a) DEFINITION OF DIVIDEND.—The term "dividend" when used in this chapter * * * means any distribution made by a corporation to its shareholders, whether in money or in other property, (1) out of its earnings or profits accumulated after February 28, 1913, or (2) out of the earnings or profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made. * * *

tofore paid were prima facie his income unless he made timely disclosure of the actual owner thereof, citing Regulations 111, section 29.147–8.[2] Although Hobson filed the requisite Forms 1087, for each taxable year prior to the running of the statute of limitations thereon, he did not file them within the time limit prescribed. For this tardiness, among other reasons, petitioners Langdon argue that such distributions should be held taxable to petitioners Hobson. We do not agree.

So far as this particular argument is concerned, the pertinent facts here are somewhat similar to those in *Ralph Hochstetter*, 34 B. T. A. 791. There the petitioner had received certain dividends on stock he held as nominee for others. He did not timely file the necessary Form 1087, but the rights of the Commissioner were not jeopardized by such delinquency. Citing the pertinent regulation which was the forerunner of and, in all material respects, identical to the one here in question, the Commissioner contended that Hochstetter was taxable on the dividends so received by him because of his tardiness in making the essential disclosure. In denying the Commissioner's contention the Board of Tax Appeals said, *inter alia:*

The purpose of the cited regulation is to provide a means by which the Commissioner will be advised of the true owner of income in ample time prior to the running of the statute of limitations to permit him to determine and assess the correct amount of tax against the true owner of the income. * * * The instant proceeding is not a case where the nominee has entirely failed to file the required form 1087. Nor is this a case where although having filed the required form it was so delinquent that the Commissioner's rights were jeopardized thereby. What our decision would be in the event of either of such situations we need not now decide. Suffice it to say that in the instant proceeding the Commissioner has not been prejudiced in any way by the failure of petitioner to file form 1087 prior to January 1935. * * *

The foregoing is particularly apposite in the instant case and the Commissioner would be unable here to invoke that provision of the regulation under discussion. Certain it is that such regulation may

---

[2] REGS. 111, SEC. 29.147–8 (As amended by T. D. 5313, December 21, 1943, T. D. 5687, Feb. 16, 1949, and T. D. 5859, September 20, 1951). INFORMATION AS TO ACTUAL OWNER.— When the person receiving a payment falling within the provisions of the Internal Revenue Code for information at the source is not the actual owner of the income received, the name and address of the actual owner or payee shall be furnished upon demand of the individual, corporation, or partnership paying the income, and in default of a compliance with such demand the payee becomes liable for the penalties provided. Dividends on stock are prima facie the income of the record owner of the stock. Upon receipt of dividends by a record owner, he should execute Form 1087 to disclose the name and address of the actual owner or payee. Form 1087 should be filed with the Commissioner of Internal Revenue, Processing Division, C. C. Station, Kansas City 2, Missouri, not later than *February 28* of the succeeding year. Unless such a disclosure is made, the record owner will be held liable for any tax based upon such dividends.

The filing of Form 1087 is not required (a) if the record owner is required to file a fiduciary return on Form 1041, or a withholding return on Form 1042, disclosing the name and address of the actual owner or payee, or (b) if the actual owner or payee is a nonresident alien individual, foreign partnership, or foreign corporation and the tax has been withheld at the source prior to receipt of the dividends by the record owner.

not be relied on by one taxpayer as against another when, as here, the true ownership of income is in controversy.

Regulations 111, section 29.147–8, *supra*, not being controlling, we turn to consideration of the true ownership of the disputed income without reference to that regulation.

The argument advanced by petitioners Langdon that the transaction was, in effect, intended to be only the re-paying of the old debt due Hobson, finds no support in the evidence. Such debt had been cancelled and extinguished prior to 1943 and was not then in existence. *Allen* v. *Trust Company of Georgia*, 180 F. 2d 527. The contention that it would be inequitable in view of Hobson's earlier actions to allow him capital gain treatment on the dividends and to place the income tax burden on Langdon, leaves us unmoved. Regardless of the niceties of the situation here, it is well settled that when a creditor accepts collateral in satisfaction of an obligation the amount by which the debt exceeds the fair market value of the property so received is deductible as a bad debt. *Commissioner* v. *Spreckels*, 120 F. 2d 517, affirming a Memorandum Opinion, Board of Tax Appeals; *Commissioner* v. *National Bank of Commerce of San Antonio*, 112 F. 2d 946, affirming 40 B. T. A. 471. See, also, *Bingham* v. *Commissioner*, 105 F. 2d 971; I. T. 3548, 1942–1 C. B. 74. If the property so acquired is subsequently sold, its basis in the hands of the creditor-vendor for the purpose of determining gain or loss is its fair market value as of the date of such acquisition. *Allen* v. *Trust Company of Georgia, supra; Bennett* v. *Commissioner*, 139 F. 2d 961, modifying and affirming a Memorandum Opinion of this Court. Attention is directed to the fact that the bad debt deduction was taken in 1938, prior to the enactment of section 23 (k) (4) which provided that for deduction purposes a nonbusiness bad debt is to be treated as a capital loss. For years prior thereto the statute allowed them in full.

Petitioners Langdon have taken the position that the transaction between Hobson and Langdon did not result in a completed sale; that title to and possession of the stock was specifically retained by Hobson until he received the full price agreed upon; and that, therefore, any dividends paid prior to the passage of title constitutes income to Hobson. In support thereof, petitioners Langdon cite *Northern Trust Co. of Chicago, Executor* v. *United States* (N. D. Ill., Dec. 1, 1950), and *Max Viault*, 36 B. T. A. 430.

In the *Northern Trust Co.* case the vendor and vendee of the stock involved entered into a written escrow agreement on August 14, 1936, which contained provisions concerning the allocation of dividends similar to those in the contract before us. The court there held that a dividend subsequently declared on December 16, 1936, out of profits earned prior to August 10, 1936, resulted in no gain, profit or benefit to the vendee. We must confess our inability to find a satisfactory

distinction between that case and the instant one unless it be in the agreement which is not fully set forth in the court's findings. Otherwise, we must respectfully differ with that decision. As for *Max Viault, supra*, we note that *Fay Harvey Moore*, 42 B. T. A. 949, has been, so far as we can find, the only decision to follow it on the issue here involved. The *Moore* case was later reversed on this point in *Moore* v. *Commissioner*, 124 F. 2d 991. Accordingly, we do not feel bound to follow the *Viault* case here.

Hobson retained possession and title to the property which formed the basis of the transaction only as security for the payment of the agreed purchase price. The beneficial use of the property was in Langdon. The dividends which came to Hobson by virtue of his being record owner, were not subject to his unfettered command, but first had to be credited against Langdon's obligation to pay the full consideration. *Long* v. *United States*, 66 Ct. Cl. 475. It has long been held that "* * * taxation is not so much concerned with refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid. * * *." *Corliss* v. *Bowers*, 281 U. S. 376; *Griffiths* v. *Helvering*, 308 U. S. 355. If the dividends here in question belonged to Hobson as ordinary income, we have the unusual situation of Hobson taking his own income to pay himself an obligation that Langdon owed him. *Moore* v. *Commissioner, supra*.

We are of the opinion that the dividends paid Hobson belonged to and were constructively received by Langdon, constituting income to him, and we so hold. Accordingly, respondent's determination in Docket No. 25951 is reversed. His determination in Docket No. 25961 is affirmed. As amended by respondent's concession on brief, respondent's holding in Docket No. 25962 is affirmed.

> *Decision in Docket No. 25951 will be entered for the petitioners.*
>
> *Decision in Docket No. 25961 will be entered for the respondent.*
>
> *Decision in Docket No. 25962 will be entered under Rule 50.*