OPINION Raum, Judge: In January 1959 RMI, as a “small business corporations,” [1] filed an election under section 1312[2] of the Code not to be subject to income taxes. The Code had then recently been amended (Sept. 2,1958) by the addition of new sections 1371-1377,[3] sometimes referred to in the aggregate as subchapter S, whereby a “small business corporation” might elect to be free of Federal income taxes with the consequence that its undistributed taxable income would in general be chargeable directly to its shareholders (sec. 1373). Such election is valid only if all the shareholders consent thereto (sec. 1372 (a)), and is effective not only for the taxable year for which it is made but also “for all succeeding taxable years” (sec. 1372(d)) unless terminated for any such year under sec. 1372 (e) .[4] Petitioner was familiar with the basic terms of subchapter S and concluded that it would be beneficial to him to have RMI make the election. He believed in good faith that he was the sole stockholder of RMI, and on January 16, 1959, as president, he signed Form 2553 whereby such election was made on behalf of RMI. He was the only stockholder listed on that form, which, in turn, was accompanied by a statement executed by him as a stockholder in which he consented to the election. An attempt was subsequently made to disavow the election, but the Commissioner treated the election as valid and binding for the years in issue, 1959-61, and charged petitioner with the undistributed taxable income of the corporation. Petitioner challenges this determination on three grounds: (1) That the election was invalid in the first instance since Serena remained a stockholder and did not consent thereto; (2) that Serena’s advances to the corporation resulted in a second class of stock which disqualified RMI as a small business corporation; and (3) that there was in any event a revocation of the election that was effective for the years 1960 and 1961. We hold that the election was valid since in our judgment petitioner was the sole stockholder and consented thereto, that there was only one class of stock, but that there was in substance a revocation which, however, was effective only as to 1961. 1. Whether petitioner was the sole shareholder in RMI in 1959.— Prior to September 20,1956, petitioner’s mother, Serena, owned all of the 100 shares of stock that had been issued by RMI. On that day she entered into a contract with petitioner and the corporation whereby petitioner assumed full management and control of RMI, and it undertook to pay her $59,504.72 on a note plus interest. Part of that note ($28,194.63) superseded a series of outstanding notes for advances that Serena had previously made to the corporation, and the remainder ($31,310.09) represented payment for 95 shares of RMI that she was selling to the corporation. An integral part of the agreement was the transfer of the remaining 5 shares to petitioner without any separately stated consideration. She endorsed the certificate for the 5 shares to petitioner who thereupon endorsed and returned it. She had also executed an assignment in blank on the certificate for the 95 shares. Under the agreement of September 20,1956, and the terms of the note, as we read those documents, she thereafter was required to hold both certificates “in escrow” as collateral security for the payments on the note. It is not disputed between the parties that if, as a result of this transaction, Serena ceased to be the owner of these shares, petitioner must be regarded as the owner of the only outstanding shares issued by the corporation. For, the corporation would be regarded as the owner of 95 shares which would be treated as treasury stock that would not be taken into account for the purpose of furnishing the required shareholder consent to the election,[5] and petitioner would thus emerge as the sole shareholder by reason of his ownership of the remaining five shares. The real dispute between petitioner and the Government is thus reduced to an interpretation of the agreement of September 20, 1956. Did that agreement result in a present sale of EMI stock by Serena accompanied by a pledge thereof to her until the note should be paid, or did she retain actual ownership thereof until the certificates were physically delivered to petitioner in 1961 when final payment of principal was made on the notes ? Although there is language in the agreement pointing both ways,[6] the dominant thrust of that agreement establishes to our satisfaction that Serena in fact parted with all beneficial interest in the 100 shares on September 20, 1956, in exchange for the $59,504.72 note and other undertakings in the agreement, that she thereafter held the certificates endorsed in blank only as security for the note, and that she retained no interest whatever in the corporation apart from her interest as a secured creditor under the terms of the agreement. Under that agreement, as we construe it, all the fruits of the enterprise were to inure to the benefit of petitioner, subject only to tbe payment of Serena’s note. In these circumstances, it is our conclusion that petitioner was'in fact the sole stockholder of RMI in January 1959 when he filed the election on behalf of the corporation and executed the shareholder consent thereto. The present situation has its counterpart in cases raising the question who, as between seller and buyer, is subject to tax on dividends declared on stock which has been the subject of a contract of sale but which has been pledged with seller pending payment of the purchase price. The result appears to be firmly established that the buyer is the true owner of the stock, regardless of who has technical legal title, and that it is the buyer rather than the seller who must account for the dividends notwithstanding that they may in fact have been paid to the seller to be applied against the purchase price. Moore v. Commissioner, 124 F. 2d 991 (C.A. 7); Estate of Arthur L. Hobson, 17 T.C. 854, acq. 1952-1 C.B. 2; Rev. Rul. 56-153, 1956-1 C.B. 166. Cf. Levy v. United States, 67 F. Supp. 958 (Ct. Cl.); Northern Trust Co. v. United States, 193 F. 2d 127 (C.A. 7); Alvin B. Lowe, 44 T.C. 363. See also Mayer v. Donnelly, 247 F. 2d 322, 326 (C.A. 5). The present case is closer to these decisions than to 2 Lexington Avenue Corp., 26 T.C. 816, upon which petitioner relies. Our conclusion that beneficial ownership of the stock, as opposed to technical legal title-thereto,[7] is critical in determining who is a shareholder, is supported by the regulations as well as the general legislative purpose underlying subchapter S. Section 1.1371-1 (d) (1) of the regulations, in dealing with the requirement that a small business corporation may not have more than 10 “shareholders,” defines that term as follows: Ordinarily, the persons who would have to include in gross income dividends distributed with respect to the stock of the corporation are considered to be the shareholders of the corporation. * * * This definition is in accord with the basic purpose of subchapter S which was recently set forth in W. C. Gamman, 46 T.C. 1, 7, as follows: the object of the provisions was to permit businesses to select the form of business organization desired, without the necessity of taking into account major differences in tax consequences. The provisions were a counterpart to the provisions enacted in the 1954 Code (see. 1361) [repealed by Congress in 1966], which permitted proprietorships and partnerships to elect to be taxed like corporations, and were designed to permit electing corporations to forgo the payment of tax and require their shareholders to report the corporate income (whether or not distributed) as their own for tax purposes. * * * See S. Kept. No. 1988, 85th Cong., 2d Sess., pp. 87-89, 1958-3 C.B. 922, pp. 1008-1010. If the holder of the naked legal title is given a veto power over the election, he would have the power to frustrate the wishes of the true owners whom Congress wished to be free to choose the corporate form of business organization without giving up the advantages of having the tax burden determined as though the enterprise were a proprietorship or partnership. The major consequence of a subchapter S election to the shareholders is that, as the price of receiving dividends undiminished by corporate taxes, they must pay tax at personal income tax rates on corporate income which they have not yet received. This may or may not be beneficial to the shareholders; obviously, the corporation’s earnings prospects, its dividend policy, the expected savings in corporate tax, and each shareholder’s personal tax bracket will play a large part in his determination of whether to consent to the election. What is important to note, however, is that in determining who is taxable on the corporation’s undistributed income, section 1.1373-1 (a) (2) of the regulations incorporates by reference the same definition of “shareholder” which was set forth in section 1.1371-1 (d) (1), supra, and which the Commissioner seeks to apply here; i.e., only those who would be taxed on an actual distribution of dividends with respect to the corporation’s stock will be taxed on a prorata share of the corporation’s undistributed income. Thus, if a “shareholder” is not in fact taxable on dividends received with respect to stock which he holds, as, for example, where he holds the stock as agent for another, cf. Rupe Investment Co. v. Commissioner, 266 F. 2d 624 (C.A. 5), affirming 30 T.C. 240, or where stock is held merely as security for the payment of an obligation, Estate of Arthur L. Hobson, 17 T.C. 854, acq. 1952-1 C.B. 2, the subchapter S election can have no effect on him and consequently there is no reason why his consent should foe required. Here, Serena was in fact only a creditor, regardless of whether she held title to the stock as security, and plainly could not have been taxed on the corporation’s undistributed earnings. Accordingly, since no part of the corporate earnings were properly allocable to her, there is no basis whatever for requiring her consent to the subchapter S election.[8] To be sure, there is a statement in the report of the Senate Finance Committee (S. Kept. No. 1983, 85th Cong., 2d Sess., p. 87) referring to the consenting shareholders as those “of record” as of the first day of the taxable year, or if the election is made after that time, as those “of record” when the election is made. While this use of the words “of record” furnishes some support for petitioner’s position, it is entirely inconsistent with the basic congressional purpose to tax the undistributed corporate income only to the persons who are accountable for dividends paid by the corporation, and those persons are the real owners of the stock whether or not they are the shareholders “of record.” In the circumstances, we must rely upon the all pervasive legislative purpose and not upon the foregoing fragmentary phrase in the committee report. In our judgment Serena was not a “shareholder” within the meaning of the statute and her consent to the election was not required. Petitioner was the sole shareholder; he caused the corporation to file the election; and he consented thereto. That was enough to constitute a valid and binding election until terminated under section 1372 (e). It was he who had the sole beneficial interest in the corporate earnings, and it was he, rather than Serena, who was chargeable with any undistributed earnings if any election were to be made under subchapter S. Indeed, it would have been wholly contrary to the framework and purpose of the statute to treat Serena as a “shareholder” and to require her consent to the election so as to render her accountable for 'any part of the undistributed earnings of KMI. Since we have concluded that petitioner was the sole shareholder, there is no basis for petitioner’s further contention that the election was made under a mistake and must for that reason be set aside. 2. Whether there were two classes of stock by reason of Serena’s advances. — Petitioner argues that even if Serena no longer owned any of the original 100 shares of stock, the subchapter S election was invalid because the demand promissory notes which she had received for her advances to KMI during the period 1951-55 were actually another class of stock and KMI for that reason failed to qualify as a small business corporation. See sec. 1371(a) (4), supra, fn. 1. We think that the point is without substance. Although Serena retained physical possession of these notes until 1961, they were no longer outstanding obligations of KMI in 1959, because the liability relating thereto had been embodied in and superseded by the $59,504.72 note given to Serena pursuant to the agreement of September 20, 1956. That note comprehended all the outstanding advances, in the aggregate amount of $28,194.63, and by January 1, 1959, the year in which the election herein was made, principal payments in the aggregate amount of $20,825 had already been made to Serena in respect of that portion of the note referable to the advances. It seems clear to us that, at least as of the taxable years herein, any obligation to Serena in respect of the advances was a bona fide debt and did not represent a capital interest like the advances in W. C. Gamman, 46 T.C. 1. We therefore do not reach the question decided in Gamman as to whether they would constitute another class of stock if they were not bon'a fide debts. We hold that only one class of stock was outstanding during the taxable years, and that RMI was a fully qualified small business corporation under section 1371 (a). 3. Revocation. — Petitioner contends finally, in the alternative, that even if there were a valid election, it was revoked by the filing of the normal corporate tax return (Form 1120) for 1959 incorporating therein a statement to the effect that the election had been filed in error. Petitioner testified that he followed this procedure as the result of a telephone conversation with an unidentified Internal Revenue Service employee in Miami in October 1959. The return was dated March 14, 1960, and was signed by petitioner as president of RMI. He did not file any separate consent to the revocation in his capacity as stockholder. Plainly, the alleged revocation, if otherwise valid, would not be applicable to 1959, because section 1372(e) (2), fn. 4, supra, makes clear that its provisions apply only to a revocation for a taxable year “after the first taxable year for which the election is effective.” As a consequence, petitioner does not argue that the election was revoked as to 1959, but he does contend that it was effective as to 1960 and 1961. However, the explicit terms of section 1372(e) (2) similarly preclude the effectiveness of the revocation for 1960. These provisions plainly state: A revocation under this paragraph shall he effective— (A) for the taxable year in which made, if made before the close 'of the first month of such taxable year, (B) for the taxable year following the taxable year in Which made, if made after the close of such first month, and for‘all succeeding taxable years of the corporation. * * * Since the alleged revocation was filed in March 1960 it could not apply, under these provisions, to the year 1960. There remains, therefore, the question whether the revocation was valid as to 1961. The final sentence in section 1372(e) (2) requires that the “revocation shall be made in such manner as the Secretary or his delegate shall prescribe by regulations.” And in this instance temporary rules were first issued September 22,1958, T.D. 6317,1958-2 C.B. 1096,1098, and published in the Federal Register for September 26,1958,23 Fed. Reg. 7484; these were then superseded by final regulations promulgated December 15,1959, T.D. 6432,1960-1 C.B. 317, 327, and published in the Federal Register December 19,1959, 24 Fed. Reg. 10294. Both the temporary rules and the final regulations (sec. 1.1372-4(b) (2)) provide in essence that the revocation must be made by the filing of a statement by the corporation accompanied by a statement of consent signed by each shareholder. Admittedly, no such formally labeled revocation was filed, nor was any separately signed statement executed by petitioner as the sole stockholder. The Government therefore argues that there has been a failure to comply with the regulations and that there was thus no valid revocation. Although the matter may not be free from doubt, we think that on the whole there was substantial compliance with the regulations. No special form of revocation is required, and we think that the statement embodied in the 1959 return may fairly be read as fulfilling the basic requirements of the regulations as to the character of the statement itself. The more difficult problem is the absence of an explicitly labeled consent by petitioner as sole stockholder. In the absence of a consent the revocation would be fatally defective and the Government would be entitled to prevail. However, petitioner did sign RMI’s return. True, he signed in the capacity as RMI’s president. But we think that, in substance, he would be bound individually by the statement of revocation in the return signed by Mm which affects not only the corporation but also its stockholders. We 'hold that in these unusual circumstances there was substantial compliance with the regulations and that there was therefore an effective revocation for 1961 and subsequent years. Cf. Fred J. Sperapani, 42 T.G. 308. Decisions will Toe entered under Bule 50. A small business corporation is defined by sec. 1371(a) as “a domestic corporation wbieb is not a member of an affiliated group (as defined in section 1504) and which does not — (1) have more than 10 shareholders; (2) have as a shareholder a person (other than an estate) who is not an individual; (3) have a nonresident alien as a shareholder; and (4) have more than one class of stock.” SBC. 1372. ELECTION BY SMALL BUSINESS CORPORATION. (a) Eligibility. — Except as provided in subsection (f), any small business corporation may elect, in accordance with the provisions of this section, not to be subject to the taxes imposed by this chapter. Such election shall be valid only if all persons who are shareholders in such corporation— (1) on the first day of the first taxable year for which such election is effective, if such election is made on or before such first day, or (2) on the day on which the election is made, if the election is made after such first day, consent to such election. Sec. 64, Technical Amendments Act of 1958, 72 Stat. 1606. Subsec. (e) deals not only with situations in which there would be automatic termination (such as the failure of new stockholders to give their consent as required, or the failure of the corporation to continue to qualify as a “small business corporation”), but it also provides for revocation of the election by the corporation itself, as follows : (2) Revocation. — An election under subsection (a) made by a small business corporation may be revoked by it for any taxable year of the corporation after the first taxable year for which the election is effective. An election may be revoked only if all persons who are shareholders in the corporation on the day on which the revocation is made consent to the revocation. A revocation under this paragraph shall be effective— (A) for the taxable year in which made, if made before the close of the first month of such taxable year, (B) for the taxable year following the taxable year in which made, if made after the close of such first month, and for all succeeding taxable years of the corporation. Such revocation shall be made in such manner as the Secretary or his delegate shall prescribe by regulations. Compare regulations sec. 1.1371-1 (g) dealing with, classes of stock, which provides: In determining whether a corporation has more than one class of stock, only! stock which is issued and outstanding is considered. Therefore, treasury stock and unissued stock of a different class than that held by the shareholders will not disqualify a corporation under section 1371(a) (4). * * * The competing considerations emerging from the agreement and note are fairly summarized by respondent as follows: Factors in support of petitioner’s position: (1) The third Whekeas clause makes reference to Alfred Hoffman ultimately becoming the sole owner of all outstanding shares of stock of Reba Martin, Inc. (2) Paragraph 6 of the agreement states that the five shares of stock are given by Serena Hoffman to Alfred Hoffman to assure sole and complete control of the corporation by him upon full payment of the indebtedness and purchase price. (3) Paragraph 8 states that upon full and final payment Serena Hoffman will deliver the certificate of stock for 95 shares to the corporation and that Alfred Hoffman shall then become the sole and exclusive owner of all of the outstanding capital stock. Factors in support of respondent’s position: (1) Paragraph 8 of the agreement states that the one hundred shares of capital stock of Reba Martin, Inc., shall be security for the payment of the indebtedness and purchase price with interest and for the complete performance by Alfred Hoffman and the corporation of the agreement. (2) Paragraph 9 states that in the event of a default by the corporation or Alfred Hoffman, Serena Hoffman shall then become the sole and1 exclusive owner of all the capital stock of Reba Martin, Inc. This indicates she was not regarded as the owner of the stock under the agreement until there was a default. (3) Paragraph 9-A states that the stock of Reba Martin, Inc., held by Serena Hoffman as security shall be released upon full payment to Serena Hoffman of the amount specified under the agreement. (4) The restrictions and agreements contained in paragraphs 13, 14, 15 and 16 of the agreement tend to indicate Serena Hoffman was regarded as a creditor in lieu of being recognized as the owner. (5) Paragraphs 19, 29 and 24 fix the liabilities of the parties with respect to taxes, an outstanding mortgage and an automobile. This tends to indicate a sale. (6) Paragraph 21 of the agreement clearly provides that Alfred Hoffman shall be in complete control of the affairs of Reba Martin, Inc., unless there is a default by him or the corporation. This indicates a sale with Alfred Hoffman assuming all of the responsibility of the business. (7) The promissory note executed with the agreement on September 20, 1956, states that the stock is to be held by Serena Hoffman as collateral security for the payment of the note. We do not mean to suggest that the title to the shares of RMI was in Serena. The point is that, regardless of who had naked title, the shares were really owned by petitioner and were merely pledged as collateral. In this connection, compare Selethn O. Thompson, 9 B.T.A. 1342, where it was said that the assignor (p. 1350) : by placing the assignment in escrow, retained the bare legal title for one purpose only, i.e., to secure payment of the notes. Neither the practical nor the legal situation differs from a conveyance of title to the vendee with a mortgage from him to the vendor to secure payment of a part of the purchase price. * * * See also 2 Williston, Sales 285 (rev. ed. 1948). Moreover, it is difficult to see how that election could in any way have been a disadvantage to her. At most it relieved the corporation of income taxes and thus enhanced the value of the security for her note. It is equally difficult to see how the election could in any way have constituted a change in the corporate structure in violation of the agreement of Sept. 20, 11956, or could have jeopardized her interests thereunder. Petitioner’s suggestions that RMI was thereby “prevented” from issuing a second class of stock, or from becoming affiliated with another corporation, or from obtaining foreign income, are all specious. No such prohibitions existed. The consequence of any such action might mean only that RMI would be disqualified as a “small business corporation” and the election would1 merely be terminated under sec. 1372(e) of the Code.