ROBERT P. and RHETTA C. GREY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Grey v. Commissioner
Docket No. 1309-72.
United States Tax Court
T.C. Memo 1974-2; 1974 Tax Ct. Memo LEXIS 317; 33 T.C.M. (CCH) 3; T.C.M. (RIA) 74002; January 8, 1974, Filed *317 Alan M. Alexander, Jr., for the petitioners. Dudley W. Taylor, for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION The Commissioner determined deficiencies in petitioners' income tax in the following amounts: Taxable Year
Amount
1966
$12,516.84
1968
6,305.76
1969
2,191.26 2 Three issues are presented for decision, two of which involves the effect of two interrelated contracts entered into by the petitioner-husband, Robert P. Grey, while the third issue pertains to the nature of petitioners' gain on the sale of a house. In particular, there are presented the questions (1) whether Grey made a bona fide investment in the stock of a corporation so as to furnish the basis for the deduction of a capital loss upon the alleged surrender of that stock in connection with the first contract; and (2) whether payments made by Grey to the original owner of the stock represented deductible compensation for services which the latter agreed to perform pursuant to the second contract. The third issue is whether the gain realized by Grey and his wife upon the sale of a house was capital in nature. FINDINGS OF FACT - GENERAL FACTS AND *318 FACTS PERTAINING TO CONTRACT-RELATED ISSUES The parties have stipulated certain facts, which, together with the attached exhibits, are incorporated herein by this reference. At the time they filed their petition, Robert P. and Rhetta C. Grey were husband and wife with their principal place of residence at Athens, Georgia. For the tax years here in issue, petitioners filed their Federal income tax returns with the southeast ser-;_. _:,___. Chamblee, Georgia. 3 In 1948 while working as a private charter flight pilot, Mr. Grey ("petitioner") first became acquainted with Ray R. Littrell, who had chartered petitioner's plane. In the course of the succeeding three years their relationship sufficiently progressed, both professionally and personally, that in 1951 Littrell hired petitioner as a full-time salaried employee. At that time, Littrell controlled and managed three companies all of which were engaged in engineering and management consultation for natural gas distribution systems. These were Littrell Gas Service Corporation, Littrell Engineering and Construction Company, a "subchapter S" corporation, and Ray R. Littrell and Associates, a tradename for Littrell doing *319 business in his individual capacity. Although petitioner, a graduate engineer, entered Littrell's employ as vice president of both corporations, he continued at the outset to act primarily as Littrell's pilot, flying him to the various municipalities with which Littrell had professional dealings. With the passage of time and under Littrell's tutelage, Grey expanded his duties to include some drafting and tracing as well as pipeline inspection, and ultimately assumed responsibility for the full management of the business. Littrell was not a registered engineer and when petitioner qualified in 1954 as a registered engineer, he became the only licensed engineer in Littrell's operations. 4 During this time, Littrell's business interests had begun to shift. Until about 1955 or 1956 Littrell's personal and corporate efforts had been devoted to assisting municipalities in installing and/or operating systems for the distribution of natural gas to their residents. Typically, Littrell, and later petitioner, contracted municipalities which were without natural gas service, promoted the idea, and when successful in their selling efforts, contracted with the municipality to undertake *320 the entire implementation. In this regard, Littrell, through his companies, arranged financing, appeared on behalf of the municipality before the interested regulatory commissions, performed the necessary engineering for the system, contracted with builders for the construction of the system and supervised its progress, advised the municipality in operational matters such as rates, and even trained meter readers. In those cases in which a municipality had previously acquired a natural gas system, Littrell offered assistance in its management and periodic inspection as well as the full range of services in the event an extension to the existing system was required. The success of such a business depended heavily upon its management's ability to gain access to and to hold the confidence of city mayors and councilmen. Before 1956 Littrell negotiated most of these contracts with the various municipalities, although petitioner was increasingly in personal contact with the cities' managers. 5 In the usual case, the parties signed a fully negotiated contract subject to the municipal electorate's approval of a bond issue, at which time the contract became income producing, or "viable". *321 "Viable" management contracts were drawn for several years' duration with ensuing successive one-year renewal options, thereby attempting to comply with those local laws which barred municipal governments from binding any future administration to such a contract. At some time prior to 1956, Littrell further diversified his interests by developing a large private utility company, Mid-Georgia Natural Gas Company ("Mid-Georgia"), in which he became the dominant figure and principal stockholder. [1] Unlike Littrell's other businesses, Mid-Georgia built and operated its own distribution and sales of natural gas. Littrell's various businesses were complementary; thus, his other companies, particularly Littrell Gas Service Corporation, performed engineering and related services for Mid-Georgia. This relationship, however, was subject to the scrutiny of the Georgia Public Service Commission (Ga. Code Ann. sections 93-304, 93-307), which, among its other duties, established each utility's permissible rate base; and the common ownership or control of a company which thus dealt with a utility was a consideration that could jeopardize the utility's rate base. *322 At about this time (1955 and 1956), Littrell lost interest in being actively involved in the engineering business; and the engineering work which had been carried on in other companies then became concentrated in Littrell Gas Service Corporation, of which he was still the sole stockholder, but which was being managed largely by petitioner. Among its other activities, it continued to perform services on behalf of Mid-Georgia. However, in order to protect the rate base of Mid-Georgia, it became important for Littrell to divest himself, or at least to appear to divest himself, of ownership of the stock in Littrell Gas Service Corporation. Accordingly, in late 1955 or early 1956, legal title to all the stock was placed in the names of petitioner and three other employees. The transaction took the form of a sale of the stock, 28 percent to petitioner and 24 percent each to the other three. The purported aggregate sales price for all of the stock was $400,000, of which petitioner's allocable portion was $112,000. Neither petitioner nor any of the other three employees made any cash payment. Instead, petitioner gave a promissory note in the amount of $112,000 and each of the other *323 three a promissory note in the amount of $96,000. The promissory notes were not introduced in evidence, and the record fails to show that they had any maturity date or that they were payable or intended to be paid in any manner other than out of earnings of the enterprise, however long that might require. The record also fails to establish that the 7 $400,000 aggregate "purchase" price was not vastly in excess of the fair market value of the shares. No payments were in fact made other than out of earnings, as hereinafter more fully described. Neither petitioner nor any of the other three employees was permitted to have possession of the certificates of stock standing in their respective names. Each was required to endorse his respective certificates in blank, which were retained by Littrell as "security" for the notes. The record is unclear as to whether the notes bore any interest. There was a "buy-sell agreement" or an arrangement between petitioner and the other three employees that if any of them "left the corporation", their stock would be "picked up" by the others or by other employees of the corporation. Petitioner was made president and the other three became *324 vice presidents of the corporation. Payments on the notes were made in the following manner: Littrell Gas Service Corporation was a subchapter S corporation, and at the end of each year there was subtracted an amount equal to the income tax payable by each stockholder [2] with respect to his allocable share of the corporate earnings for that year, which he would use for such purpose; the remainder would then be paid to Littrell as part payment on such stockholder's note. During the period 1956-1962 petitioner was the dominant person in the management and conduct of the day-to-day operations 8 of Littrell Gas Service Corporation. By 1962 the other three employees had "left the corporation". As each left the employ of the corporation he ceased being a stockholder. He simply "walked away" from the stock and was paid no consideration therefor.By 1962 petitioner had succeeded to an additional 20 percent of the outstanding stock which had formerly been "owned" by the other three *325 stockholders. He did not pay them anything therefor. The shares relating to that 20 percent were held in the same manner as the 28 percent originally issued in petitioner's name, i.e., they were endorsed in blank and retained by Littrell as security for the payment of the note or notes executed in respect thereof. The record does not disclose the so-called "purchase" prices for these additional shares. Petitioner made no payment therefor at the time of the alleged sale or sales, but corporate earnings allocable thereto were distributed in part to petitioner to be used to pay income taxes thereon and the remainder paid over to Littrell to be applied against the applicable note or notes. Thus, by October 31, 1962, 48 percent of Littrell Gas Service Corporation stock stood in petitioner's name, and the aggregate of all payments of corporate earnings made to Littrell in respect of the notes relating to those shares was $60,093. The remaining 52 percent of the stock was allocated by Littrell to one or more other employees of the corporation under arrangements 9 similar to those in effect with respect to petitioner's stock. The employees under such arrangements were merely "straw" *326 men for Littrell and served the purpose of concealing Littrell's ownership of the stock, thereby protecting the rate base of Mid-Georgia in which Littrell was primarily interested at that time. The arrangement also afforded Littrell the opportunity to characterize as capital gain rather than ordinary income the corporate earnings of Littrell Gas Service Corporation which were paid over to him under the guise of payments on purchase money notes. In 1962 petitioner decided to leave Littrell Gas Service Corporation and to engage in the same business on his own behalf. To this end he entered into negotiations with Littrell, which culminated in the execution of two contracts on October 31, 1962, one with Littrell Gas Service Corporation and the other with Littrell individually. Both contracts were part of a single package, and were drawn by a lawyer who was an employee of Littrell or of one of his companies; the two contracts were intended together to provide for an effective transfer of the corporation's engineering consultation business to petitioner, particularly that aspect of its business relating to its servicing of municipal natural gas systems (but not including that part of *327 its business relating to Mid-Georgia and some private utility companies). The first contract, between petitioner and Littrell Gas Service Corporation, provided in major part as follows: 10 THAT WHEREAS, Robert P. Grey has resigned as President and a member of the Board of Directors of the Company to enter into private practice as a professional engineer, and; WHEREAS, the Company is desirous of obtaining from Grey the 48% of its capital stock which Grey owns so that it may have this stock to be used to attract personnel which the Company will need to replace Grey. Said stock being assigned to Ray R. and Elberta L. Littrell as security for notes on which there is outstanding to the Littrell's [sic] the sum of $95,907.09, and; WHEREAS, it is desired by this writing for Grey to convey this stock to the Company subject to the said indebtedness in exchange for certain contracts and equipment of the Company the value of which has been calculated to equal the value, less the indebtedness, of said stock. NOW THEREFORE, in consideration of the premises it is hereby agreed by the parties as follows: 1. The Company accepts the resignation of Grey as President and a member *328 of the Board of Directors of the Company. 2. Grey hereby assigns his stock to Company to be transferred by Company to the personnel it will hereafter employ to replace Grey. 3. The Company hereby transfers and assigns to Grey all of its right, title and interest in and to those certain management contracts and that certain equipment of Company as set out particularly on the schedule attached to this agreement as Exhibit "A", which schedule is hereby incorporated in this agreement and made a part hereof. 11 Exhibit A, referred to in part 3 of the foregoing contract, listed the following items transferred to petitioner: (1) a 1958 Ford automobile and a small quantity of office supplies; and (2) all the engineering files relating to work done by Littrell Gas Service Corporation, Littrell Engineering and Construction Co., Ray R. Littrell and Associates, and all predecessor companies (except files relating to Mid-Gerogia and several other specified companies), and in particular the files "inclusive of all Contracts and Agreements between the above named [Littrell] companies" and 18 specifically designated Georgia municipalities. The second of the two contracts, between *329 petitioner and Littrell individually, provided in major part as follows: 12 THAT WHEREAS, Robert P. Grey has resigned as President of Littrell Gas Service Corp. to enter into private engineering practice, having acquired from Littrell Gas Service Corp. certain management contracts with municipalities owning natural gas systems, and; WHEREAS, Ray R. Littrell owns certain other management contracts which Grey desires to acquire, and; WHEREAS, Grey desires to obtain the services of Littrell as consultant for a period of time in order to more smoothly effect the absorption of the management contracts into Grey's practice; NOW THEREFORE, in consideration of the premises the parties hereby agree as follows: 1. Littrell hereby conveys and assigns to Grey all of the management contracts plus that certain equipment as listed on the schedule marked Exhibit "A", attached hereto and made a part hereof. 2. Ray R. Littrell also agrees for a period of 7 years from date to make himself available for consultation on any matters concerning natural gas engineering work on which Grey, through said management contracts or through additional work which may be obtained subsequent to *330 this agreement, may require his advice. 3. Grey agrees to pay to Littrell as compensation for the management contracts and for his consultation agreement the sum of $56,000, subject to adjustment upward or downward as hereinafter provided, payable as follows: $1,000 upon the signing of this agreement. $3,000 on May 1st., 1963. 13 $4,000 on or before November 1st., 1963. $4,000 on each 1st. day of May and each 1st. day of November for the next succeeding 6 years. Any payment not paid when due shall bear interest at 6% per annum until paid. 4. The annual payments shall be increased or reduced in amount in conformity with the following formula: (a) The contracts conveyed to Grey by Littrell and the contracts conveyed to Grey by Littrell Gas Service Corp. developed gross fees in the amount of $41,316.60 for the 12 months ending August 31, 1962. However, the contract with the City of Warner Robins has been re-negotiated to an annual fee of $6,500 which is a reduction of $7,917.20 and the gross billings to the City of Cochran in the amount of $2,492.60 have not been paid and were charged off as a bad debt and the City of Eatonton fee of $1,594.80 is non-recurring. *331 The resultant adjustments give an expectation of fees in 12 months of $29,311. For the purposes of this agreement, $29,311 is considered to be the "normal annual fees". (b) Should the normal annual fees be reduced through the loss or re-negotiation of any of the contracts to a sum less than $29,311 in any particular year then, and in that event, the annual payment to Littrell, for that particular year only, shall be reduced by an amount equal to one-half of the amount that the fees for the 12 months ending October 31st. of that year fall below $29,311, and the decrease shall be considered as a decrease in the over-all price. 14 (c) In the event the regular fees under the operating contracts increase above $29,311 through growth of the systems or through additional customers tying on to the systems, Grey agrees to increase his payments to Littrell for that particular year in the amount equal to 50% of all amounts in excess of $29,311, and the amount so paid shall be considered in the increase of an over-all price. Any fees collected by Grey in connection with extensions to existing systems or new natural gas systems, Littrell shall receive in the year that such fees are *332 collected the first $4,000 of such fees. Any fees above the $4,000 shall be split equally between Littrell and Grey. The amount so paid shall be considered an increase in the over-all price. For purposes of this paragraph, the fee shall be the gross amount collected for a particular service less the cost of performing that service. "Normal Annual Fees" are considered to be derived only from consultant fees on the contracts conveyed to Grey by Littrell and Littrell Gas Service Corp. (d) Any increase or decrease in the annual amount due Littrell shall be adjusted on the November 1st. payment following the close of the 12 months ending October 31st. in any year in which an increase or decrease in the normal annual fees occurred. Exhibit A to the second contract listed certain items of business equipment such as a typewriter, duplicating machine, calculator, desks, file cabinets, and the like. In substance, the net effect of the two contracts of October 31, 1962, was to transfer to petitioner the going engineering consultation business that was being conducted 15 with respect to municipal natural gas systems.The good will and files relating to that business represented *333 the principal asset (intangible) transferred. The tangible physical assets covered by the two contracts were of distinctly secondary significance and had a value of between $2,000 and $5,000. The various contracts with the municipalities had originally been negotiated some years earlier by Littrell, and the only such contracts in evidence (11 in number) were formally between the respective municipalities and Littrell individually or Ray R. Littrell and Associates (Littrell's sole proprietorship which was sometimes referred to as a partnership). All of the contracts had expired, but Littrell Gas Service Corporation nevertheless continued to service the natural gas systems of the municipalities up to October 31, 1962, as its customers or clients. After petitioner, as an individual commenced to conduct the engineering consultation business as his own on November 1, 1962, under the name of "Robert P. Grey, Consulting Engineer", he renegotiated the contracts in his own name. Littrell's name and reputation were of considerable importance to Grey, and he regarded his association with Littrell as significant in effecting the transition of the business to him in his own name. As already *334 indicated, by the time the October 31, 16 1962 contracts were entered into, Littrell had ceased being active on a day-to-day basis in the conduct of the business of Littrell Gas Service Corporation, and petitioner had already established personal relationships with the various municipalities that were being serviced by the corporation. However, Littrell continued to accompany petitioner up to October 31, 1962, in visiting client municipalities when major difficulties arose or when an unusually large project was the subject of negotiation. Petitioner in fact had very little need for any services to be performed by Littrell after October 31, 1962, and Littrell in fact performed no services whatever for petitioner after that date. After paying Littrell $8,000 in 1962 and 1963 according to the schedule of payments agreed upon in the second contract of October 31, 1962, petitioner refused to make the $4,000 payment due on May 1, 1964, or any payment due thereafter. Littrell thereupon brought suit against petitioner in the United States District Court for the Middle District of Georgia, which entered the following order on September 15, 1965, granting partial summary judgment against *335 petitioner: 17 In October, 1962 plaintiff and defendant signed a written contract whereby plaintiff conveyed to defendant certain management contracts with municipalities having natural gas systems. The contract set up a method whereby defendant would pay plaintiff for said contracts. Defendant made some of the payments and then discontinued making payments. A copy of the contract is attached to the complaint. The defendant's answer admitted the signing of the contract, admitted his failure to keep up the payments, and set up certain defenses. Thereafter depositions of both parties were taken and then the plaintiff filed his motion for summary judgment on the question of liability only, said motion being based upon the pleadings and said depositions. It now appearing that there is no genuine issue as to any material fact with respect to the validity of the contract or with respect to any of the defenses pleaded, this court now rules that said contract is a valid contract, voluntarily entered into by both parties, and that the plaintiff is entitled to recover thereon whatever amounts, if any, he can establish by evidence as being due thereunder. Because of the formula *336 for determining the amount due under the contract, the amount is a question of fact to be hereafter determined in an appropriate manner. It appears without dispute that the defendant had paid to the plaintiff the sum of $1,000.00 due upon the signing of the contract, the sum of $3,000.00 due on May 1, 1963, and the sum of $4,000.00 due on or before November 1, 1963, and has made no further payments. This partial summary judgment is hereby rendered accordingly. In accordance with that order, petitioner paid Littrell $30,000 (plus interest) in 1966 and an additional $20,000 (plus interest) in 1968. 18 The two issues relating to the two contracts of October 31, 1962, grow out of petitioner's "surrender" of his 48% stock interest in Littrell Gas Service Corporation in 1962, and the payments of $30,000 and $20,000 in 1966 and 1968, respectively. On their joint Federal income tax return for 1962 petitioners claimed a $53,057 long-term capital loss in respect of the termination of petitioner's interest in Littrell Gas Service Corporation, which they computed as follows: Equity in Littrell Gas Service Corp. Stock
$60,093
Physical Assets Acquired
$2,036
Cash Value of Contracts Acquired
5,000
7,036
Net Long-Term Capital Loss
$53,057
*337 The $60,093 figure, purporting to represent petitioner's "equity" in his alleged 48 percent interest in the corporation, was the aggregate net after-tax amount of the corporation's earnings theoretically allocable to the stock standing in petitioner's name that had been paid to Littrell over the years from 1956 up to October 31, 1962. Petitioners had no 1962 net capital gains against which the foregoing claimed $53,057 capital loss could be applied, with the result that $1,000 was applied against ordinary income. In an audit of the 1962 return, a revenue agent revalued the contracts at $16,613, thereby reducing the capital loss in the above computation to $41,444. Petitioners filed an amended return for 1962 using the lower capital 19 loss figure. Petitioners carried over the unused net long-term capital loss to subsequent years, offsetting both long-term capital gains and ordinary income in those years as set out below: Year
Long-Term Capital Gains Offset
Ordinary Income Offset
1966
$36.00
$1,000.00
1968
1,519.00
1,000.00
1969
951.00
1,000.00
The Commissioner determined that petitioners "did not sustain a capital loss from the sale or exchange *338 of stock in Littrell Gas Service Corporation in 1962", and therefore disallowed the capital loss carryovers to 1966, 1968, and 1969 which depended upon the claimed 1962 capital loss. In their 1966 return petitioners also claimed as a "miscellaneous" deduction the $30,000 paid that year to Littrell pursuant to their litigation. Petitioners stated in that return that - The payments to Ray R. Littrell are in satisfaction of a contract requiring payments of fees and retainage to Mr. Littrell for his services and are a proper operating obligation of Robert P. Grey d/b/a/ Robert P. Grey, Consulting Engineer, Inc.
Likewise in their 1968 return, petitioner claimed a deduction for the final $20,000 payment. In his notice of deficiency, the Commissioner determined that: the amounts of $30,000 in 1966 and $20,000 in 1968 claimed as deductions for payments to Ray R. Littrell are not deductible because it has not been established that such payments represent deductible items under any section of the Internal Revenue Code. 20 OPINION RAUM, Judge: 1962 loss. Petitioners claim that Mr. Grey "traded" his alleged 48 percent stock interest in Littrell Gas Service Corporation in *339 1962 for a group of municipal contracts and some physical assets, and that as a consequence he sustained a deductible long-term capital loss which was carried over to the tax years in issue. The Government, on the other hand, argues that Grey never owned any beneficial interest in the corporation, that he never really made any investment in its stock, and that he therefore sustained no loss in respect of any such stock in 1962. Alternatively, it contends that even if he had owned such stock, he in fact suffered no loss as shown by the third Whereas clause of the first of the two contracts of October 31, 1962, in which the consideration allegedly received for such stock was stated to be equal to the net value of the stock. We hold that the Government must prevail. [3]
*340 21 We are convinced on the materials before us that petitioner did not in fact have any bona fide ownership of 48 percent or any other percent of the stock of Littrell Gas Service Corporation. We are satisfied that the alleged ownership of stock by petitioner and the other employees was merely a facade to conceal Littrell's true ownership of the entire enterprise, that the profits of the enterprise were being paid out to Littrell under an arrangement calculated to persist for an extended period by reason of an alleged aggregate purchase price ($4000,000) that was obviously grossly excessive, [4] and that petitioner really never made any investment in the stock of the corporation which could serve as the basis for the deductible capital loss claimed by him. It is a *341 cardinal rule that, in characterizing a cluster of events upon which tax consequences turn, "transactions, which do not vary control or change the flow of economic benefits, are to be dismissed from consideration". Higgins v. Smith, 308 U.S. 473, 476. 22 The underlying principle has been variously stated, and in Jack E. Golsen, 54 T.C. 742, affirmed 445 F.2d 985 (C.A. 10), certiorari denied 404 U.S. 940, we referred to it and noted its extent as follows (54 T.C. at 754): It has repeatedly been held that the substance of a transaction rather than the form in which it is cast is determinative of tax consequences unless it appears from an examination of the statute and its purpose that form was intended to govern. The following represent merely a random selection from a wide variety of such cases that are too numerous for comprehensive listing: Commissioner v. P. G. Lake, Inc., 356 U.S. 260, 265-267; commissioner v. Court Holding Co., 324 U.S. 331, 334; Griffiths v. Helvering, 308 U.S. 355; *342 Higgins v. Smith, 308 U.S. 473; Minnesota Tea Co. v. Helvering, 302 U.S. 609; Gregory v. Helvering, 293 U.S. 465; Weller v. Commissioner, 270 F. 2nd 294 (C.A. 3), affirming 31 T.C. 33 and W. Stuart Emmons, 31 T.C. 26; William R. Lovett, 37 T.C. 317. [5]
A realistic examination of all the facts in this case leads us strongly to the conclusion that there was not any genuine sale of stock by Littrell to Grey or the other employees in 1955 or 1956, and that Grey did not in fact own any such stock in 1962 which could form the basis for a capital loss. 23 The touchstone of a valid stock sale for purposes *343 of taxation is the actuating intent or purpose of absolutely divesting oneself of ownership of the shares purportedly sold. Lulu Tirrill Coombs, 30 B.T.A. 35, 39; Sydney M. Shoenberg, 30 B.T.A. 659, 661, affirmed 77 F.2d 446 (C.A. 8), certiorari denied 296 U.S. 586; Rev. Rul. 72-225, 1972-1 C.B. 59. And when, in spite of compliance with the form of a sale, the transferor retains the economic benefits which typically accompany stock ownership, there is strong evidence that the requisite intent for a sale is absent. Cf. National Lead Co. v. Commissioner, 336 F.2d 134, 141 (C.A. 2), certiorari denied 380 U.S. 908; MacDonald v. Commissioner, 76 F. 2d 513, 514-515 (C.A. 2); James M. Hallowell, 56 T.C. 600, 607-609. In the case at bar there is every indication that Littrell never intended to part with his control of the corporation, nor did petitioner and his fellow employees understand otherwise. In this regard it is particularly significant that the economic positions of the respective parties to the initial "sale" in 1956 never varied. The purported new owners *344 continued to receive a salary as their sole compensation; they derived no benefit from the profits which were distributed to them, and which were used only to pay taxes on the amounts of corporate income theoretically allocable to the stock standing in their respective names. Indeed, in light of the practice of the 24 so-called stockholder-employees of "walking away" from their stock upon termination of their employment, it is obvious that they had no interest in the corporation's profitability beyond that evinced by any employee with regard to the corporation's continued viability as an employer. Littrell, on the other hand, continued to receive the corporate profits (enhanced, perhaps, by the combined effect of income splitting among his employees at presumably lower surtax levels and capital gains treatment of the remainder in his own hands) through what can be characterized only as a conduit. The evidence persuades us that by periodically redistributing his stock among the employees when one or more of them "left" the corporation, Littrell intended to and in fact did preserve his control and ownership of the corporation through, as petitioner conceded at the trial, a series *345 of straw men. And we are satisfied that petitioner's alleged stock ownership rested on no firmer foundation than that of other employees who were admittedly merely straw men. While it is true that the mere fact that an agreement for the sale of stock contemplates payment out of future corporate earnings with the vendor retaining possession of the stock as security does not of itself taint the sale (cf. Moore v. Commissioner, 124 F.2d 991, 993 (C.A. 7), reversing 42 B.T.A. 949; De Guire v. Higgins, 159 F.2d 921, 923 (C.A. 2), reversing 65 F. Supp. 445 (S.D. N.Y.); Alfred N. Hoffman, 47 T.C. 218, 233, affirmed per curiam 391 F.2d 930 (C.A. 5); Estate of Arthur L. Hobson, 17 T.C. 854, 861), the situation here differs in that, in our judgment, the transfer of distributed profits to Littrell created only the illusion of payment pursuant to a bona fide sale. As we view the evidence, Littrell retained the stock, not as security, but rather to assure his unfettered control over the corporation and *346 to enjoy the fruits of its operations. 25 We find and hold that petitioner did not in fact make any bona fide purchase of stock from Littrell or others either in 1955 or 1956 or thereafter and that therefore petitioner did not effect a sale or exchange of stock in 1962 resulting in a capital loss. In the circumstances we find it unnecessary to consider the Government's alternative contention based on the third Whereas clause that no loss was in any event sustained upon the "surrender" of the stock in 1962. Petitioners contend that since the Commissioner audited their 1962 income tax return and specifically allowed, with some adjustment, a deduction for capital loss arising from the exchange of the Littrell Gas Service stock, the Government is now estopped or otherwise precluded from determining that there was no capital loss carryover available to petitioners in 1966, 1968 and 1969. The point is without merit. It is well established that the Commissioner is not subject to any estoppel or similar disability in such circumstances. Dixon v. United States, 381 U.S. 68; *347 Automobile Club v. Commissioner, 353 U.S. 180; Union Equity Cooperative Exchange v. Commissioner, 481 F.2d 812, 817 (C.A. 10), affirming 58 T.C. 397, certiorari denied U.S. . Caldwell v. Commissioner, 202 F.2d 112, 115 (C.A. 2); George R. Tollefsen, 52 T.C. 671, 681, affirmed, 431 F.2d 511 (C.A. 2), certiorari denied 401 U.S. 908; David O. Rose, 55 T.C. 28, 31-32. 27 The record convincingly establishes that the two contracts of October 31, 1962, were in substance but parts of a single package whereby the consulting engineering business (as it related to servicing municipal natural gas systems) was transferred and sold to petitioner. These contracts were loosely drawn, and to some extent contradictory (e.g., both referred to the transfer of management contracts to petitioner). However, there is no doubt in our mind that they were intended together to provide for the sale of a going business to petitioner, and that the payments agreed to by petitioner were intended primarily to represent the purchase price for that busines, however described, and not as fees for services *348 to be rendered by Littrell. Indeed, the order of the District Court requiring petitioner to make the payments called for under his agreement with Littrell characterized them as payments for "management contracts with municipalities having natural gas systems", and we read that language simply to refer to the transfer of the engineering consultation business relating to the municipalities. The District Court made no mention of fees for consultation, and Littrell in fact rendered no services of any kind to petitioner at any time after October 31, 1962. 28 To be sure, the principal components of the business transferred to petitioner were intangibles such as good will and data contained in the files. And it may be that some part of the consideration payable to Littrell may have been for the expectation of some services by him that would facilitate the transfer of that good will to petitioner. However, petitioner paid Littrell $8,000 during the first year beginning October 31, 1962, in accordance with the schedule agreed upon in the contract, and petitioner undoubtedly took deductions in respect of the $8,000. [6] Accordingly, even if some portion of the amounts called for in *349 the contract could properly be allocable to fees for "consultation services" which Littrell agreed to furnish, we cannot find on this record that such allocation would exceed the $8,000 which has already been deducted. The $30,000 and $20,000 payments in 1966 and 1968, respectively, were entirely capital in nature, and did not represent to any extent any fees for consultation services that were either rendered or expected to be rendered by Littrell. And since they were capital in nature they could not be deducted as business expenses. 26 2. Deductibility of 1966 and 1968 payments to Littrell . Petitioners contend that the payments to Littrell, $30,000 in 1966 and $20,000 in 1968, pursuant to the second contract of October 31, 1962, and the order of partial summary judgment, constituted "consulting fees" which are deductible as business expenses. We hold otherwise. These payments were merely non-deductible capital expenditures that were made to acquire a business. Paragraph 3 of the October 31, 1962 contract between petitioner and Littrell characterized *350 the payments which Grey agreed to make to Littrell "as compensation for the management contracts and for his consultation agreement". The "management contracts" had already expired, and the reference to "management contracts" obviously was merely a loose way of identifying that portion of the business relating to the conduct of a management consulting service for municipal natural gas systems - a business in which the municipalities that were parties to the expired management contracts were customers or clients. The negotiations had been between petitioner and Littrell, who plainly regarded himself as being the owner or in full control of that business, without giving any particular consideration to whether it was being conducted in part or in whole in the name of Littrell Gas Service Corporation or in some other way, with the consequence that the two contracts of October 31, 1962, were thought to be necessary in order to make an effective transfer of that business to petitioner. 29 FINDINGS OF FACT - SALE OF HOUSE In 1968, petitioners were engaged in the business of building houses for sale ("speculative houses"). They sold one such house which they had constructed that *351 year, and reported a loss of $82 on that sale which was deducted from ordinary income on their 1968 Federal income tax return. They also stated in that return under a caption reading "Speculation Home Building" that a second house was being constructed which "will be sold in 1969, at which time it will be reported * * * ". Construction of the second house was in fact completed in 1969; it was sold in 1969, and petitioners reported a long-term capital gain of $899 on their 1969 return in respect of that sale. In 1968 and 1969 petitioners owned two houses which they reported rental income in the aggregate net amounts (after deductions) of $565 and $320 for 1968 and 1969, respectively. The Commissioner determined that the $899 gain realized upon sale of the house completed in 1969 was taxable as ordinary income since the property was held for sale to customers in the ordinary course of trade or business. 30 OPINION Petitioner testified at the trial that he and his wife owned some six or seven houses in 1968 and 1969, that they held houses for rental purposes, that the house which they sold in 1969 was built by them for such purpose, and that the reason that they sold *352 that house was that it "came in at much too high a cost to rent it". We simply do not believe that testimony. The returns for 1968 and 1969 in evidence show that petitioners owned only two houses, not six or seven; which they held for rental purposes, that they were engaged in addition in the business of building speculative houses for sale, and that the house completed in 1969 was in the latter category. The $899 gain on sale of that house was therefore properly classified by the Commissioner as ordinary income. Decision will be entered for The respondent . Footnotes
1. He also became interested in a Florida company which was engaged in making concrete blocks and providing ready-mixed concrete. However, this company does not appear to have any connections with the transactions involved herein.↩
2. The use of the word "stockholder" is intended merely to identify the person in whose name the stock had formally been issued, and is not intended as a finding that he was a bona fide stockholder. ↩
3. We were faced with considerable difficulty in the consideration of this case by reason of the manner in which it was presented by petitioners' counsel and the confusion in the record that resulted therefrom. We warned counsel at least several times, both on and off the record, that the burden of proof was upon petitioners and that they must bear the consequences of any deficiencies in the record. Where evidence is vague or wholly absent from the record we cannot assume that it would be favorable to the party having the burden of proof; certainly in such circumstances the party having the burden of proof cannot profit from the inadequacies of the record. ↩
4. The record contains no specific evidence as to the true value, but petitioners' counsel himself referred to the alleged purchase price as a "pie in the sky figure", and we cannot assume in the context of the record before us that it was anything but a grossly excessive amount that would never have been agreed to by parties bargaining at arm's length with one another in good faith. See footnote 3, supra. ↩
5. The Fifth Circuit within which the present case arises has often taken the same approach. See, e.g. Crenshaw v. United States, 450 F.2d 472, 475-476 (C.A. 5), certiorari denied 408 U.S. 923; Casner v. Commissioner, 450 F.2d 379, 387-389 (C.A. 5); Waterman Steamship Corporation v. Commissioner, 430 F.2d 1185, 1192-1194↩ (C.A. 5). 6. In petitioners' reply brief it is admitted that "Grey "expensed out" this $8,000 on his 1963 income tax return". ↩